IN THE MATTER OF AN APPLICATION ON BEHALF OF
ARCHIBALD HERRON, AN ALLEGED INSANE PRIS-
ONER IN CONFINEMENT IN THE STATE PRISON.

Argued February Term, 1909—Decided March 3, 1909.

The insanity of a person who is in confinement awaiting execution
under a capital sentence cannot be tested by a proceeding taken
under section 13 of the act of 1906. *Pamph. L., p.* 722.

This writ brings up the refusal of the judge of the Mercer
County Court of Common Pleas to institute an inquiry re-
specting the insanity of one Archibald Herron, who is con-
fined in the state prison at Trenton, awaiting execution
under a sentence of death pronounced by the Court of Oyer
and Terminer of Middlesex county. The judge to whom the
application was made declined to institute the inquiry, be-
cause, in his judgment, the section of the statute under which
the proceedings were taken (*Pamph. L.* 1906, *p.* 722, § 13)
did not permit an inquiry into the mental condition of a
person under sentence of death.

Before Justices REED, TRENCHARD and MINTURN.

For the prosecutor, *Charles T. Cowenhoven.*

*Contra, Nelson B. Gaskill,* assistant attorney-general.

The opinion of the court was delivered by

REED, J. In the matter of Lang, reported in *ante p.* 207,
an inquiry into the sanity of a person confined under a
capital sentence was entertained by the judge of the Court
of Common Pleas of Middlesex county, a jury empaneled
and a verdict returned. The proceedings were taken in al-
leged conformity with section 13 of the act of 1906, *supra.*
The proceedings were taken by writ of *certiorari* to this
court, and afterward from this court to the Court of Errors

and Appeals by writ of error. The error complained of was that the trial judge refused to charge that insanity within the purview of the act of 1906, section 13, included every species of insanity, and extended to all derangement and unsoundness of mind. The Court of Errors and Appeals found no error in so refusing to charge, and affirmed the finding of the jury.

The only question before the appellate courts was whether the trial judge had laid down a test of insanity under the statute which prejudiced the prisoner. Whether the prisoner was entitled to any trial at all by the judge, or by a jury empaneled by the judge, was not passed upon. Indeed, in affirming the judgment of the Supreme Court, the Court of Errors and Appeals was careful to say that it did not decide that the question of the insanity of a person who is in confinement awaiting execution under a capital sentence can be tested by a proceeding taken under the thirteenth section of the act of 1906. *Pamph. L., p.* 722.

In view of these precautionary remarks, no doubt the judge of Mercer county determined to have his right to entertain an application of like character definitively settled before entering upon an inquisition which might subsequently be held to be a nullity.

So, the question is now whether the legislature intended that the provisions of section 13 should apply to persons confined, awaiting the death penalty.

The language of the thirteenth section respecting the class of persons in confinement on whose behalf an application can be made, is comprehensive. It includes all persons in confinement under commitment, indictment or sentence, or under any other process.

The prosecutor was not in confinement under a commitment or indictment, and the query is whether within the meaning of this section he was in confinement under sentence. It is to be observed that confinement under sentence, as a rule, means under an imprisonment imposed as a punishment by force of a judicial sentence. But the imprisonment of one awaiting execution under a death sentence, is

not considered to be a part of the punishment. *State* v. *McGinn,* 46 *Neb.* 427.

Under, the Electrocution act (*Pamph. L.* 1906, *p.* 112) the sentence is to the punishment of death—the method by which death is to be inflicted is provided for by the act, and not by the sentence. The sentencing court signs a warrant stating the conviction and sentence and appointing a week within which such sentence must be executed, and commanding the principal keeper of the state prison to execute it upon some day within the week so appointed. The sheriff must deliver this warrant, within ten days after it is issued, to the principal keeper of the state prison.

The statute then enacts that from the time of such delivery to him, until the infliction of the punishment of death upon him—unless he shall be lawfully discharged from such sentence—the prisoner so sentenced shall be kept in solitary confinement, with the exception of being permitted to receive the visits of some privileged persons named.

Now, this confinement, while an incident of the sentence, or, to speak more accurately, an incident of the warrant, is not technically an imprisonment under the sentence. This is a technical point, and unless some other feature of the act adds force to this construction, it would doubtless be held that the imprisonment is a legal consequence of the sentence and warrant, and so can be said to be a result of and under both.

But it is to be again observed that the act of 1906 is mainly intended as a unification of preceding acts which have been regarded, as far as they have dealt with an inquisition into the sanity of persons imprisoned, as applying to those who were imprisoned for punishment. As to this class of persons, the scheme of these acts and the scheme of the act of 1906 are not unreasonable. Even the provision that when a person is found to be insane and is thereupon sent to an asylum, that he shall not be discharged therefrom and returned to the prison unless by the fiat of the superintendent of the asylum, cannot be said to be unreasonable. Where a person under sentence of imprisonment as a punishment is

transferred from a penitentiary to an asylum, it is not a transition from imprisonment to liberty. Whether in a hospital or a prison, the convict is a prisoner. Indeed, a prison may have a ward for insane patients, and an asylum a ward for insane convicts. It is true that in the asylum he may escape hard labor, but so may any sick convict in the state prison. The removal of a prisoner who is to serve out his sentence of imprisonment, to a place provided with all the appliances for medical treatment, is a humane provision, having a practical purpose.

As remarked by Mr. Justice Parker in his opinion, *In re Lang, supra,* "The prisoner has his life to live, and public policy requires that he be so treated as to live it to the best advantage."

That the prisoner remain in confinement in an asylum until fully restored to reason, is a humane substitute for confinement in a prison where there are no adequate means for mental treatment.

When, however, a person is confined to await the execution of a death sentence, the conditions are radically different. The removal to an asylum for treatment in such a case would be merely a removal for the purpose of restoring him to that degree of sanity which, at common law, was not inconsistent with his execution. An inquisition into the condition of a convicted murderer was in common law only for the purpose of determining whether the execution of the sentence should, for the time, be arrested. If the finding was in favor of the prisoner's insanity, it afforded him only temporary immunity, for upon recovering the requisite degree of sanity he could then be executed.

And it is to be observed that an inquisition in common law was under the control of the trial court. 4 *Bl. Com.* 24; *Nobles* v. *Georgia,* 168 *U. S.* 398. It alone decided when the circumstances suggested an inquisition, and it conducted the inquisition itself, or supervised the calling and return of the jury. Aside from the power of the crown to pardon because of insanity—just as it could pardon for any other cause— the sole control over the question of insanity was in the trial

court. In this state, up to the passage of the act of 1906, *supra,* no other practice has ever been suggested.

And in this connection it is not insignificant that the control of cases for murder has remained in the Supreme Court and the Court of Oyer and Terminer. Jurisdiction over all other crimes has been vested in the Courts of Quarter Sessions, but the legislature has preserved the jurisdiction over cases of treason and murder exclusively in the Supreme Court and the Court of Oyer and Terminer, and, excepting in counties of over three hundred thousand inhabitants, the Court of Oyer and Terminer must be held by a justice of the Supreme Court.

Turning to section 13 of the act of 1906, it is perceived that it gives to any person included within the operation of the act, the right to select the judge to whom he may make his application for an inquisition. He may select a justice of the Supreme Court, or a judge of the Circuit Court, or a judge of the Court of Common Pleas, if the first of these presides in the county, and the other two are judges of the county where the applicant is imprisoned. Then if he is found insane upon the inquisition conducted by his selected judge, he is removed to an institution for the care and treatment of the insane, owned by the state or by a county in the state. When once there, the power of the court or judge over him ceases, and no power to punish thereafter revives, unless the medical director shall present to the judge a certificate that said person has been restored to reason—not restored to a degree of sanity where a person is able to appreciate his position as a sentenced criminal, but restored to reason.

Now, as already remarked, in those cases where it is only a question whether a convict shall be imprisoned in a penitentiary or an asylum, the existence of this power thus put into the hands of a single medical expert, and the failure of the legislature to indicate any type of insanity, the restoration to which type shall return the prisoner to his former place of imprisonment matters little, or not at all.

But where a sentence is not to imprisonment, but a sen-

tence to death, it seems impossible to believe that the legislature, under language so general in character, with no allusion to this exceptional situation, intended that the sentenced person should be immune from punishment.

It is settled by the Lang case that it was not the legislative intention that such person should be removed to an asylum merely because he was insane, but, on the contrary, that he was to be removed only when a particular type of insanity was judicially found to exist. It must follow that it was not the legislative intent that such convict should be retained in the asylum after his recovery from this particular type of insanity, although he might still be in a degree insane.

It is true that it may be held that the restoration to reason mentioned in the statute means only a restoration to that degree of reason consistent with his execution, yet, even so, it is not conceivable that the legislature meant that the question whether a person had been restored to this condition should be left to a single expert, with no legal standard fixed by the statute to guide in the inquiry, rather than left under the control of some court or judicial magistrate, by and through whom the ascertainment of the test could be controlled according to a legal as well as medical standard.

Again, if the legislature intended that the power of removal under section 13 extended to persons under sentence of death, why was not the power to reprieve or stay the sentence, or why was not some provision that the application under section 13 should operate as a stay, coupled with the power of removal? An application for an inquisition may be made to a judge—as it was in this case—during the week fixed by the warrant for the execution. Before the inquisition can be begun, or completed, the prisoner may be executed. No power but that of the governor can save him from the execution of the sentence before the final order for removal is made, yet no power of reprieve is conferred upon the judge to whom application is made under section 13.

At common law reprieves after judgment were of three kinds—*first,* at the pleasure of the crown; *second,* in the discretion of the court; *third,* of necessity, which latter was in

the case of a woman convict, alleging pregnancy when called for sentence. 12 *Cyc.* 790, citing 1 *Ch. Cr. L.* 758; 2 *Hawk P. C.* 658, § 9.

If the act of 1906 includes prisoners under capital sentence, a proceeding for the removal of such an insane convict on the ground of his insanity would seem to be exclusively under that statute, at least it would strip the trial court of any power to take any action respecting the prisoner because of his alleged insanity.

It is hardly conceivable that the legislature, if it meant section 13 to apply to such a situation, would not have provided for this contingency.

It was mainly upon the ground that the power of reprieve was lodged in the governor that it was held in Baranoski's case, reported in 9 *Pa. Co. Ct.* 264, approving other cases cited, that the Pennsylvania acts of 1874 and 1883 permitting an application to the courts on the part of persons in charge of a penitentiary, prison or hospital for the insane, to inquire into the sanity of any person convicted of a crime, had no application to a person convicted of murder in the first degree—the remedy in such cases being by application to the governor.

Again, an examination of the several statutes dealing with the treatment of insane convicts leads to the conclusion that the term "in confinement under sentence" does not mean in confinement under sentence to death. The history of the several statutes dealing with this subject is set out in Mr. Justice Parker's opinion in the Lang case, *supra.* In the act of 1847 (*Nix. Dig., p.* 526) it was provided : "If any person in confinement, under indictment, or under sentence of imprisonment, or for want of bail for good behavior, or for keeping the peace, or appearing as a witness, or in consequence of any summary conviction, or by order of any justice, or under any other than civil process, shall appear to be insane, the judge of the Circuit Court of the county where he is confined shall institute a careful investigation," &c. The clause "or under sentence of imprisonment" was repealed in 1848. *Pamph. L., p.* 213, § 7. The act of 1847 without this

clause was retained in the revision made under the act of 1871. See Revision 1877, p. 612, § 23, *sub tit.* Asylum act.

In the revised Criminal Procedure act of 1898 it was provided, "if any person confined in any jail," &c., section 169, "or any state prison," section 172, "under sentence of imprisonment, shall appear to be insane, the judge of the Circuit Court of the county might institute an inquisition," &c. In these acts was the provision that after the removal of the convict to an asylum, the superintendent of that institution should notify the judge of the convict's restoration.

The act of 1906, containing section 13, obviously intended to put in one statute all the instances where the judge could remove an insane prisoner to an asylum. For the sake of terseness, words were transposed and phrases clipped. Instead of employing all the words in the statutes of 1847 and 1898, the draughtsman of the act of 1906 meant to include all instances in one brief statement, without repetition or redundancy. So instead of saying that "if any person in confinement for want of bail for good behavior, for keeping the peace, or appearing as a witness," &c., he said, "if any person in confinement under a commitment," &c. So instead of saying, "if any person in confinement under sentence of imprisonment," he coupled the sentence with confinement and indictment, and left out the words "of imprisonment," obviously deeming that if a person was confined under sentence, he was imprisoned under sentence—he was confined or imprisoned under sentence of imprisonment. So that the words "in confinement under sentence" in the act of 1906 means the same as confined under sentence of imprisonment in the preceding acts.

For these reasons we conclude that the legislature did not intend that the procedure provided for in section 13 of the act of 1906 should apply to a person confined in the state prison awaiting execution under a capital sentence.