Shank *v.* Todhunter.

4-3907

Opinion delivered October 29, 1934.

W. T. Pate, Jr., *Robert J. Brown, Jr.,* and *Blake C. Cook,* for appellant.

*Walter L. Pope,* Attorney General, and *Robert F. Smith,* Assistant, for appellee.

Baker, J.   Mark Shank was convicted of murder in the first degree in the Saline Circuit Court, and condemned to be executed. After he was sent to the penitentiary in Jefferson County, application was made to S. L. Todhunter, superintendent of the Arkansas State Penitentiary, requesting that he select a jury of twelve men from the regular panel of Jefferson County petit jury to hold an inquisition as to the present sanity, or insanity, of the said Mark Shank. The petitioner sought the aid of § 3251 of Crawford & Moses' Digest. The section is as follows: "When the sheriff (superintendent of the

State Penitentiary) is satisfied that there are reasonable grounds for believing that the defendant is insane, or pregnant, he may summon a jury of twelve persons on the jury list drawn by the court, who shall be sworn by the sheriff (superintendent of the State Penitentiary) well and truly to inquire into the insanity or pregnancy of the defendant and a true inquisition return,'' etc.

S. L. Todhunter, the superintendent, denied the application of petitioner asking the inquisition. Then this suit was filed in the circuit court of Jefferson County, and on Wednesday, July 25, March term of the circuit court, the court upon a hearing, found that the petitioner was not entitled to the relief prayed for, the issuance of a mandate ordering the said S. L. Todhunter to proceed under § 3251 of the Digest to hold the said inquisition. It is this order, made by the circuit court of Jefferson County, that we are asked to review.

The case of *Shank* v. *State* was before this court on May 14, 1934, and the conviction of Shank was affirmed. See *ante* p. 243.

The defense offered upon the trial of Shank for the murder charge was his insanity. This question was very thoroughly presented and considered on the trial of the case, and the jury found against the contention of the appellant.

The allegations in the instant case are to the effect that Shank is now insane, and that on that account he should not be electrocuted. There were submitted to the superintendent affidavits of four physicians. Each of the affidavits was substantially the same in form as the other and to the effect that the affiant had observed and examined Mark Shank, confined in the death cell at Tucker to await execution; that from personal observation and careful study of his family, and personal history, it was the opinion of the physician that Shank is now insane and affected with an incurable mental disease.

Since the judgment of the circuit court of Saline County imports a verity to the effect that Shank was not insane at the time of the trial, it is argued, but not stated, that if he is now insane, such insanity has come about since the trial and conviction. The only proof of present

insanity arises out of the affidavits. Because of its *ex parte* nature, proof of controverted facts, by affidavit, is sometimes not very satisfactory or conclusive. It usually states, as these affidavits do, conclusions of the affiant, without a development of the facts upon which affiant predicates his statement. The physicians say that they have observed and examined Shank, and, from personal observation and careful study of his family and personal history, they form the opinions expressed as to his insanity. All of the family history and also personal history of Shank that was available was presented at his trial at the time of his conviction. We do not say now that, if a hearing were had at this time, this evidence would not be available to determine his present condition, but we are saying that it was not the intention of the statute to permit, or allow, the sheriff, or, in this case, the superintendent of the State penitentiary, to try again the questions already determined by the trial court, and reviewed and affirmed by the Supreme Court. If Shank's insanity had not been presented to the court at any time, and had not been tried, a somewhat different situation would have been presented.

No affidavit contains a statement of any fact observed, upon which the opinion of the physicians is based, or that tends to show any real difference in the condition of Shank at this time and at the time of his trial and conviction. From the record before us, we do not know and cannot find any such alleged fact. If his actual condition now be the same as it was then, and there is nothing to show that it is different, the facts have already been determined. This, no doubt, was the viewpoint of the learned trial judge, when he denied the prayer of the petitioner to issue a mandate to require the superintendent to hold the inquisition.

The situation in this case is somewhat incongruous. There is no specific allegation that Shank has become insane since the date of his trial. There is the allegation that he is now insane. If his present condition is not now the same that it was at the time of his trial and conviction, the facts showing this changed condition could have

been alleged and, no doubt, proof could have been offered upon it. That was not done.

The court held in the case of *Howell v. Kincannon,* 181 Ark. 58, 24 S. W. (2d) 953, that, since the passage of act No. 55 of the Acts of the General Assembly of 1913, the Superintendent of the State penitentiary should hold inquisitions which were formerly held by sheriffs, under §§ 3250 and 3251 of Crawford & Moses' Digest, and that this gave to an insane condemned person who has no further recourse in law a remedy where none other existed, and the reason for so holding is set out in the following language: "At the time this statute was passed the sheriff was the executioner, and had the custody of the person of the defendant from the date of judgment to that of execution, and he was therefore the only one who could have full and free access to the presence of the defendant, and observe him during the time of his confinement before execution; and, since by the enactment of act No. 55, *supra,* all these duties and opportunities for observation have passed from the sheriff to the keeper of the penitentiary, the only way by which those sections of our Code, *supra,* can be given any practical effect is by substituting the keeper of the penitentiary for the sheriff."

A casual reading of the statutes relied upon would indicate that, under ordinary conditions at least, the inquisition to determine insanity arising after the sentence of death seems to be upon the initiative of the Superintendent of the Penitentiary. Since the Superintendent is presumptively, at least, a man of somewhat keen observation, discriminatory powers, good judgment, his observation and judgment would be such that, upon the institution of inquisition by him, most careful consideration would be accorded to his views, but, on the other hand, his refusal to proceed under this statute necessarily demands a showing, by affirmative proof, of an abuse of discretion, or an unquestioned neglect of duty, before his conduct may be made the subject of judicial criticism.

The superintendent of the penitentiary was requested to hold such inquisition. He refused. He would

not initiate one. His refusal is in writing, and this matter comes to us upon an allegation that he has abused, or, at least, neglected to exercise, whatever discretion may be lodged in him by the statute, and that is the only question we have to determine. The affidavits, though made by men of the highest type and character, do not state facts sufficient to warrant an interference. After a careful consideration of the law argued in the briefs, we are impelled to agree with the trial court.

The judgment is affirmed.