ODOM, Justice.
 

 A. Prudent Hebert was charged in a bill of information filed by the district attorney with the crime of forging a check for $290,-000 drawn on the Calcasieu-Marine National Bank of Lake Charles, La., purporting to have been signed by his brother, Dr. Louis Hebert. When arraigned, the accused had no counsel, ’ but personally entered a plea of not guilty. Subsequently the court appointed counsel to represent him. But before the attorney who was appointed was notified of his appointment and before he appeared in court, the district attorney suggested to the court that he had “grounds to believe the defendant to be insane.” Whereupon, the court appointed a “commission
 
 *321
 
 composed of Dr. C. P. May, of New Orleans, La., and Dr. C. B. Hatchette, of Lake Charles, La., to inquire into the sanity of the defendant.” Defendant’s counsel came into court the same day, but after the commission had been appointed, and filed a motion to set aside the appointment of the commission on the ground that the appointment had been made during his absence and without any plea of present insanity having been made for the defendant. This motion was taken under advisement by the court, and while it was pending the commission came into court with its report, which was filed over the objection of counsel.
 

 The commission reported that it had kept the defendant under personal observation for a period of two days and that in their opinion he was presently insane, was incapable of understanding the difference between right and wrong, did not appreciate the usual, natural, and reasonable consequences of his acts; and that because of his mental condition he was unable to understand the proceedings against him or assist in his defense. In due course, the court adjudged the defendant to be presently insane and ordered*that he be committed to the hospital for the insane and placed and kept in a ward known as the “Ward for the Criminal Insane.”
 

 The court’s finding that the defendant was presently insane was based upon the report made by the two physicians appointed by him.
 

 Counsel for defendant then applied to this court for writs to prohibit the execution of the judgment. The writs were denied (186 La. 308, 172 So. 167) and the case remanded with instructions that defendant be permitted to summon and examine such additional witnesses as he might desire in order to contradict the findings of the commission appointed by the court. When the case came on in the district court for retrial as directed by this court, counsel for the defendant summoned and took the testimony of six physicians and eight lay witnesses. After hearing these witnesses, the court again pronounced the defendant presently insane and reinstated his former judgment. Whereupon, counsel for defendant again applied to this court for writs, which were denied on the ground that defendant’s remedy was by appeal. Defendant then appealed to this court.
 

 ■ [1] The state filed a motion to dismiss the appeal on two grounds, the first being that the appeal was not taken in time, and the second being that the judgment appealed from does not finally dispose of the case.
 

 In support of the motion to dismiss the appeal on the ground that it was taken too late, the state relies on article 542 of the Code of Criminal Procedure, which provides that:
 

 “The party desiring to appeal in a criminal case shall make in open court a motion for an appeal verbally or in writing, within ten judicial days after the rendition of the judgment complained of.”
 

 The judgment pronouncing the defendant insane and ordering him sent to the hospital for the insane and there confined in a ward set apart for the criminal insane, was rendered and signed on February 16, 1937. The appeal was not taken until March 5, more than ten days later. But in the meantime the defendant through counsel had
 
 *323
 
 applied to this court for writs, which were denied on March 1, on the ground that defendant’s remedy was by appeal. The appeal was, therefore, taken in less than ten days after the case was remanded. Under all the circumstances, the defendant cannot be charged with the delays caused by the application for writs. There is, therefore, no merit in the state’s motion to dismiss the appeal on this ground.
 

 The motion to dismiss on the second ground is also without merit. Counsel for the state say in their brief on page 8:
 

 “The State earnestly and seriously contends that the ruling or judgment complained of in the present case is not final and does not finally dispose of the case, nor is it prejudicial, and such being the case, it is not appealable under any law or rule, or any provision of the Code of Criminal Procedure.”
 

 Counsel are in error. The only issue involved in the present proceeding relates to the defendant’s mental status at the time he was called to the bar for trial on the forgery charge. As to that issue, the court held that he was insane at that time and there was judgment ordering:
 

 “That this defendant be committed to the ‘Ward for the Criminal Insane’ at the East Louisiana State Hospital at Jackson, Louisiana, until such time as he shall be declared to be restored to sanity.”
 

 That is a final judgment in so far as the trial court is concerned, because it finally disposes of the only issue involved.
 

 That judgment is highly prejudicial to the accused because it deprives him of his liberty.
 

 Defendant did not raise the issue involving his mental status by pleading insanity, nor did the issue arise during or after the trial of the criminal charge brought against him. The issue arose before the trial, when the district attorney suggested to the court that the defendant might be presently insane, and the court appointed a lunacy commission.
 

 A proceeding of this kind is authorized by Act No. 136 of 1932. While that act says nothing about an appeal from a judgment rendered before the trial, decreeing that an accused is presently insane and ordering that he be sent to the insane asylum and there confined in a ward for the criminal insane, our opinion is that an appeal lies from such a judgment because it is final in so far as the only issue involved in such a proceeding is concerned and is prejudicial because it deprives the party of his liberty. See article 540, C.C.P.
 

 Counsel suggests that in criminal cases this court cannot consider the facts. But a proceeding of this kind is not a “criminal case,” but is a proceeding which grows out of and is incidental to a criminal case. This is not like a case in which insanity is pleaded as a defense and the plea is submitted to the jury.
 

 The district court based its findings in this case solely on the report of the experts appointed by it. These experts reported that the defendant was presently insane and that by reason of his insanity “he does not appreciate the difference between right and wrong; he does
 
 not
 
 appreciate the natural, probable and usual consequences of his acts; and he is unable to assist his counsel in the defense of his case.”
 

 
 *325
 
 Article 425 of the Code of Criminal Procedure reads as follows:
 

 “The report of every Commission of Lunacy shall he prima facie evidence of the facts recited in such report and of the correctness of the findings of such commission.”
 

 In State v. Patterson, 176 La. 440, 146 So. 17, it was held that while the opinions of insanity experts are not conclusive, they are of great value, and that the court is not warranted in arbitrarily substituting its own opinion for that of the experts. It was further held that the court may hear testimony in rebuttal of that given by the experts and that the final conclusion of the court as to whether the defendant is sane or insane should be based upon the testimony as a whole.
 

 In the case at bar the experts after making their report to the court were called as witnesses, and their testimony is in the record. With due respect to them, we find and hold that their report made to the court is not supported by their testimony.
 

 The conclusion reached by them was based solely upon their interviews with the defendant, which extended over a period of about two days. They found him sound physically and found that there was no physical deterioration of his brain. They said he had no hallucinations and no illusions, but “showed signs of persecutory delusions,” a false belief that he was being persecuted. Their testimony shows that defendant entertained no delusions that any one except his brother, Dr. Louis Hebert, was persecuting him. In sum, they found from conversations with the defendant that he entertained ill feelings toward his brother, and as to this Dr. Hatchette said: “His opinions along those lines have gotten beyond hatreds, they have gotten beyond dislikes, they have come to the point where they are obsessions.”
 

 Dr. Hatchette said further that the defendant had “persecutory delusions based on illogical facts.” He explained that what he meant was that defendant had reasoned “illogically” in reaching the conclusion that his brother was persecuting him. But he admitted that he did not know the facts on which the defendant based his conclusion. He was asked: “Then your position is that he could not be logical in his imagination, if it was an imagination only and not a reality, is that it?” The doctor answered: “It is purely imagination, in my opinion.” But the doctor admitted that his opinion was not based upon any facts aside from those stated by the defendant. He was asked in what manner the defendant’s illogical conclusions that his brother was persecuting him would interfere with the assistance he might be able to give his counsel at the trial, and he said: “In this respect, that his actions and his thoughts have been based upon illogical reasoning, and under those circumstances his actions have been guided by illogical reasoning:” He was then asked whether the defendant’s actions in regard to the commission of the crime with which he was charged were those to which he referred, and he said: “I suppose so, sir.”
 

 In this connection it is well to state that the defendant was charged with forging his brother’s name to a check for $290,000 on a bank, and further that there seems to be a controversy between the defendant and his
 
 *327
 
 brother over the settlement of a large succession in which both are interested.
 

 Further asked concerning his statement that defendant reasoned illogically, Dr. Hatchette said that he reasoned illogically about “anything that involves his brother, Dr. Louis Hebert,” and further stated that he thought that in assisting his counsel he would not reason logically in telling him things that he had done in regard to the forgery, the reason why he had forged the check. Dr. Hatchette was asked: “Now, you have arrived at the conclusion that the-defendant is presently incapable of discerning right from wrong when his brother, Dr. Louis Hebert, is involved, is that it?” His answer was, “That is it.” But the doctor made it perfectly clear that in his opinion the defendant did know right from wrong and that he reasoned logically on all matters concerning people other than his brother. This is shown by the following quotation from the record:
 

 “Dr. Hatchette: This man intellectually, I think, is above the average. I think he is a smart individual. Emotionally, I think he is off.
 

 “Q. He is off where?
 

 “A. Mentally, with regard to those instances I have told you about.
 

 “Q. It is only with reference to his brother, isn’t it?
 

 “A. Yes, sir, and affairs involving his brother.”
 

 The doctor was asked whether he would change his mind as to the mental status of the defendant if he could be convinced that the facts stated to him by the defendant were true, and he said that he might do so. We quote the following questions and answers, which are highly pertinent:
 

 “Q.
 
 Do you think this man believes it would be wrong to steal money from a bank by forgery?
 

 “A. Yes, I do.
 

 “Q. Do you think he knows that a man who is convicted of forgery can be sent to the penitentiary?
 

 “A. Yes, I think he knows that
 

 “Q. Do you think he believes it is right for a man who is convicted of forgery to be sent to the penitentiary?
 

 “A. In speaking of any man, yes, sir. I don’t think he realized for a minute that forgery in this particular case was wrong.
 

 “Q. He realizes he has a pretty good chance of going to the penitentiary, doesn’t he?
 

 “A. Yes. * * *
 

 “Q. Well, Doctor, you don’t doubt the accused’s ability to appreciate right and wrong as between you and me?
 

 “A. I don’t doubt that. I think he is perfectly capable of choosing between right and wrong between you and me.
 

 “Q. And between him and the bank, you think he is perfectly capable?
 

 “A. I think so.'
 

 “Q. You think he is perfectly capable of determining right and wrong as people generally understand that term or expression?
 

 “A. Yes, sir, except — ”
 

 The doctor was questioned concerning his report made to the court. He was asked:
 

 
 *329
 
 “Q. You say he does not appreciate the natural, usual and probable consequences of his acts. Now suppose he was to be handed a gun, and turn it on me and shoot me, don’t you think he has sense enough to know the probable consequences of that act of his ?
 

 “A. If he should shoot you?
 

 “Q. Yes, suppose the Sheriff handed him over his gun, and he turned it on me and shot me, don’t you think he has sense enough to know the consequences of that act?
 

 “A.
 
 Yes, I think so.
 

 “Q. Suppose he shot the Judge?
 

 “A. Yes.
 

 “Q. Or the Clerk?
 

 “A. Yes.
 

 “Q. Or you?
 

 “A. Yes, I think he would realize it.
 

 By the Court:
 

 “Q. Dr. Hebert?
 

 “A. No, I don’t think he has the same reasoning toward Dr. Hebert as he'would have toward me or you or anyone else in this court room.”
 

 In sum, the doctor made it perfectly plain that if he could be convinced that the defendant had reasonable grounds for believing that his brother was persecuting him and reasonable grounds for the hatred of his brother, he would change his mind about his mental status.
 

 Dr. C. P. May was the other expert appointed by the court. Examined by the court, Dr. May stated that in his opinion the defendant did not know it was wrong to do what he was accused of having done, that is, to forge his brother’s name to a check. He did not say that in his opinion the defendant did not know right from wrong. The judge said to him: >
 

 “Q. I take it from what has gone so far' that if this man were charged with forgery not in connection with his brother, that he would believe it would be wrong to commit the forgery?
 

 “A. It is impossible -for me to regard this man in any other way except as a man who is mentally deranged. I do firmly believe that he is mentally disordered, and I believe that anything he does is going to show the influence of that mental disorder.”
 

 “Q. What I am trying to get at is wheth-er or not he manifests this mental disorder in regard to anything, any transaction not connected with his brother?
 

 “A. I don’t think I get the distinction you make.
 

 “Q. * * * What I want to find out is whether he believes any other similar trans- ' action would involve moral turpitude, if his brother was not connected with it. Suppose he forged a check on the Sheriff, and got money on it, would he think that was wrong ?
 

 “A. I think he might think that was-wrong, yes, sir.”
 

 Dr. May seemed to think that the defendant knew right from wrong generally and realized the nature of his acts and the usual consequences of doing wrong, but he was. of the opinion that in this particular instance, that is, with reference to forging his brother’s name to the check, he did not realize that he was doing wrong.
 

 Taking tne testimony of these two experts as a whole, we think there is no basis for the holding that this defendant is unable to assist his counsel in his defense.
 
 *331
 
 From what they say, it is probable that he will over-state the facts if and when he is called as a witness at the trial. But it is certain, we think, that he is able to state his case correctly from his own standpoint As to whether it was wrong for him to commit the act alleged to be forgery is a matter to be determined by the jury. His reason for committing the act has not been explained.
 

 The defendant called six physicians, including the parish coroner, who, after examining the defendant, submitted the following report:
 

 “Pursuant to your order, we the undersigned duly qualified doctors of Medicine have thoroughly examined into the mental condition of A. Prudent Hebert and beg to report that in our opinion A. Prudent Hebert is sane and fully appreciates the difference between right and wrong.”
 

 Seven laymen were called by the defendant, and each of them stated that in his opinion the defendant understood the difference between right and wrong and that he was fully capable of assisting his counsel in making a defense. Both the physicians and the laymen stated the facts on which they based their conclusions. While the opinion of physicians who are not experienced in psychiatry is not to be so highly regarded as that of those who are versed in that branch of science, yet their conclusions based upon facts are not to be disregarded. The same is true with reference to the opinions of laymen.
 

 Viewing the testimony of all the witnesses as a whole, our opinion is that the judgment appealed from is erroneous, and accordingly it is reversed and this proceeding is dismissed.