## SOLESBEE *v.* BALKCOM, WARDEN.

No. 77. Argued November 15, 1949.—Decided February 20, 1950.

*Benjamin E. Pierce* argued the cause and filed a brief for appellant.

*Eugene Cook,* Attorney General of Georgia, submitted on brief for appellee. With him on the brief were *Claude Shaw,* Deputy Assistant Attorney General, and *J. R. Parham,* Assistant Attorney General.

MR. JUSTICE BLACK delivered the opinion of the Court.

Petitioner was convicted of murder in a Georgia state court. His sentence was death by electrocution. Subsequently he asked the Governor to postpone execution

on the ground that after conviction and sentence he had become insane. Acting under authority granted by § 27–2602 of the Georgia Code[1] the Governor appointed three physicians who examined petitioner and declared him sane. Petitioner then filed this habeas corpus proceeding again alleging his insanity. He contended that the due process clause of the Fourteenth Amendment required that his claim of insanity after sentence be originally determined by a judicial or administrative tribunal after notice and hearings in which he could be represented by counsel, cross-examine witnesses and offer evidence. He further contended that if the tribunal was administrative its findings must be subject to judicial review. The trial court sustained the constitutional validity of § 27–2602, holding that determination of petitioner's sanity by the Governor supported by the report of physicians had met the standards of due process. The State Supreme Court affirmed, 205 Ga. 122, 52 S. E. 2d 433. The constitutional questions being substantial, see *Phyle* v. *Duffy*, 334 U. S. 431, 439, the case is here on appeal under 28 U. S. C. § 1257 (2).

In affirming, the State Supreme Court held that a person legally convicted and sentenced to death had no statutory or constitutional right to a judicially conducted

---

[1] "Disposition of insane convicts. . . . Upon satisfactory evidence being offered to the Governor that the person convicted of a capital offense has become insane subsequent to his conviction, the Governor may, within his discretion, have said person examined by such expert physicians as the Governor may choose; and said physicians shall report to the Governor the result of their investigation; and the Governor may, if he shall determine that the person convicted has become insane, have the power of committing him to the Milledgeville State Hospital until his sanity shall have been restored, as determined by laws now in force. . . ." Ga. Code Ann. § 27–2602 (1074 P. C.); Acts 1903, p. 77.

or supervised "inquisition or trial" on the question of insanity subsequent to sentence.[2] It viewed the Georgia statutory procedure for determination of this question as motivated solely by a sense of "public propriety and decency"—an "act of grace" which could be "bestowed or withheld by the State at will" and therefore not subject to due process requirements of notice and hearing. The court cited as authority, among others, our holding in *Nobles* v. *Georgia,* 168 U. S. 398. Compare *Burns* v. *United States,* 287 U. S. 216, 223.

In accordance with established policy we shall not go beyond the constitutional issues necessarily raised by this record. At the outset we lay aside the contention that execution of an insane person is a type of "cruel and unusual punishment" forbidden by the Fourteenth Amendment. See *Francis* v. *Resweber,* 329 U. S. 459. For the controlling Georgia statutes neither approve the practice of executing insane persons, nor is this petitioner about to be executed on such a premise. It is suggested that the reasoning of the Georgia Supreme Court in this case requires us to pass upon the state statute as though it had established a state practice designed to execute persons while insane. But we shall not measure the statute by some possible future application. Our holding is limited to the question of whether the method applied by Georgia here to determine the sanity of an already convicted defendant offends due process.

Postponement of execution because of insanity bears a close affinity not to trial for a crime but rather to reprieves of sentences in general. The power to reprieve has usually sprung from the same source as the power to

---

[2] "No person who has been convicted of a capital offense shall be entitled to any inquisition or trial to determine his sanity." Ga. Code Ann. § 27–2601 (1073 P. C.); Acts 1903, p. 77.

12

pardon. Power of executive clemency in this country undoubtedly derived from the practice as it had existed in England. Such power has traditionally rested in governors or the President, although some of that power is often delegated to agencies such as pardon or parole boards. Seldom, if ever, has this power of executive clemency been subjected to review by the courts. See *Ex parte United States,* 242 U. S. 27, 42, and cases collected in Note, 38 L. R. A. 577, 587.

We are unable to say that it offends due process for a state to deem its Governor an "apt and special tribunal" [3] to pass upon a question so closely related to powers that from the beginning have been entrusted to governors. And here the governor had the aid of physicians specially trained in appraising the elusive and often deceptive symptoms of insanity. It is true that governors and physicians might make errors of judgment. But the search for truth in this field is always beset by difficulties that may beget error. Even judicial determination of sanity might be wrong.

Recently we have pointed out the necessary and inherent differences between trial procedures and post-conviction procedures such as sentencing. *Williams* v. *New York,* 337 U. S. 241. In that case we emphasized that certain trial procedure safeguards are not applicable to the process of sentencing. This principle applies even more forcefully to an effort to transplant every trial safeguard to a determination of sanity after conviction. As was pointed out in the *Nobles* case, *supra,* to require judicial review every time a convicted defendant suggested insanity would make the possibility of carrying out a sentence depend upon "fecundity in making suggestion after suggestion of insanity." *Nobles*

[3] *Nobles* v. *Georgia,* 168 U. S. 398, 409.

v. *Georgia, supra,* at 405–406. See also *Phyle* v. *Duffy, supra.* To protect itself society must have power to try, convict, and execute sentences. Our legal system demands that this governmental duty be performed with scrupulous fairness to an accused. We cannot say that it offends due process to leave the question of a convicted person's sanity to the solemn responsibility of a state's highest executive with authority to invoke the aid of the most skillful class of experts on the crucial questions involved.

This leaves the contention that the Georgia statutes do not make provisions for an adversary hearing in which a convicted defendant can be present by friends, attorneys, or in person, with the privilege of cross-examining witnesses and offering evidence. Whether this Governor declined to hear any statements on petitioner's behalf, this record does not show. We would suppose that most if not all governors, like most if not all judges, would welcome any information which might be suggested in cases where human lives depend upon their decision.

Both the *Nobles* and the *Phyle* cases stand for the universal common-law principle that upon a suggestion of insanity after sentence, the tribunal charged with responsibility must be vested with broad discretion in deciding whether evidence shall be heard. This discretion has usually been held nonreviewable by appellate courts.[4] The heart of the common-law doctrine has been that a suggestion of insanity after sentence is an appeal to the conscience and sound wisdom of the particular tribunal which is asked to postpone sentence. We cannot say that the trust thus reposed in judges should be denied governors, traditionally charged with saying the last word that spells life or death. There is no indication

---

[4] See cases collected in Notes, Ann. Cas. 1916E, 424 *et seq.;* 49 A. L. R. 801 *et seq.;* 38 L. R. A. 577 *et seq.*

that either the Governor or the physicians who acted on petitioner's application violated the humanitarian policy of Georgia against execution of the insane. We hold that the Georgia statute as applied is not a denial of due process of law.

*Affirmed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

In the history of murder, the onset of insanity while awaiting execution of a death sentence is not a rare phenomenon. The legal problems which such supervening insanity raises happily do not involve explorations of the pathological processes which give rise to the conflict between so-called legal and medical insanity. See *M'Naghten's Case,* 10 Cl. & F. 200 (1843); Glueck, Mental Disorder and the Criminal Law *passim* (1925); Minutes of Evidence before the 1949 Royal Commission on Capital Punishment. The case now before the Court presents a familiar constitutional issue placed in the setting of a claim of supervening insanity.

The question is this: may a State without offending the Due Process Clause of the Fourteenth Amendment put to death one on whose behalf it is claimed that he became insane while awaiting execution, if all opportunity to have his case put is denied and the claim of supervening insanity is rejected on the basis of an *ex parte* inquiry by the Governor of the State? This issue was before the Court very recently, but in the circumstances the matter was not ripe for decision. *Phyle* v. *Duffy,* 334 U. S. 431. On the record before us the issue must be met. Unlike the situation in *Phyle* v. *Duffy,* it cannot be urged that the Georgia judgment under

review leaves open the opportunity for a hearing which was given when *Phyle* v. *Duffy* went back to the California courts. 34 Cal. 2d 144, 208 P. 2d 668. We cannot avoid now deciding whether one awaiting electrocution who makes a substantial claim that he has become insane can be denied opportunity to address the mind of the Governor, or those who advise him, in order to establish the fact of such insanity. In *Phyle's* case, the Court recognized "the gravity of the questions here raised under the due process clause." 334 U. S. at 439. Apparently between June 1948 and today the gravity seems to have been dispelled. These grave questions are now almost summarily answered. It cannot be due to the weightiness of the argument presented at the bar of this Court for none was made here by Georgia, and its slight brief hardly discusses the problems.

The immediate question before us depends on the view one takes of the legal right of a State to execute a person become insane after sentence. If the Due Process Clause of the Fourteenth Amendment does not bar the State from infliction of the death sentence while such insanity persists, of course it need make no inquiry into the existence of supervening insanity. If it chooses to make any inquiry it may do so entirely on its own terms. If the Due Process Clause does limit the State's power to execute such an insane person, this Court must assert the supremacy of the Due Process Clause and prohibit its violation by a State.

The Court in an easy, quick way puts this crucial problem to one side as not before us. But in determining what procedural safeguards a State must provide, it makes all the difference in the world whether the United States Constitution places a substantive restriction on the State's power to take the life of an insane man. If not to execute is merely a benevolent withholding of the

right to kill, the State may exercise its benevolence as
it sees fit. But if Georgia is precluded by the Due
Process Clause from executing a man who has tempo-
rarily or permanently become insane, it is not a matter
of grace to assert that right on behalf of the life about
to be taken. If taking life under such circumstances is
forbidden by the Constitution, then it is not within the
benevolent discretion of Georgia to determine how it will
ascertain sanity. Georgia must afford the rudimentary
safeguards for establishing the fact. If Georgia denies
them she transgresses the substance of the limits that the
Constitution places upon her.

Does the Due Process Clause then bar a State from
executing a man under sentence of death while insane?
It is now the settled doctrine of this Court that the Due
Process Clause embodies a system of rights based on
moral principles so deeply embedded in the traditions
and feelings of our people as to be deemed fundamental
to a civilized society as conceived by our whole history.
Due process is that which comports with the deepest
notions of what is fair and right and just. The more
fundamental the beliefs are the less likely they are to
be explicitly stated. But respect for them is of the very
essence of the Due Process Clause. In enforcing them
this Court does not translate personal views into con-
stitutional limitations. In applying such a large, untech-
nical concept as "due process," the Court enforces those
permanent and pervasive feelings of our society as to
which there is compelling evidence of the kind relevant
to judgments on social institutions.

That it offends our historic heritage to kill a man who
has become insane while awaiting sentence cannot be
gainsaid. This limitation on the power of the State to
take life has been part of our law for centuries, recog-
nized during periods of English history when feelings
were more barbarous and men recoiled less from brutal

action than we like to think is true of our time. Due process is itself "a historical product," *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31, and it requires no expansion of its purposes to find in the Fourteenth Amendment a restriction upon State action that carries such impressive credentials of history as does that forbidding the State to kill an insane man though under sentence of death:

"It was further provided by the said Act of 33 H. 8. that if a man attainted of treason became mad, that notwithstanding he should be executed; which cruell and inhumane law lived not long, but was repealed, for in that point also it was against the common law, because by intendment of law the execution of the offender is for example, *ut poena ad paucos, metus ad omnes perveniat*, as before is said: but so it is not when a mad man is executed, but should be a miserable spectacle, both against law, and of extreame inhumanity and cruelty, and can be no example to others." Coke, Third Institutes 6 (1644).

"And it seems agreed at this Day, That if one who has committed a capital Offence, become *Non Compos* before Conviction, he shall not be arraigned; and if after Conviction, that he shall not be executed." 1 Hawkins, Pleas of the Crown 2 (1716).

". . . for nothing is more certain in Law, than that a Person who falls mad after a Crime suppos'd to be committed, shall not be try'd for it; and if he fall mad after Judgment, he shall not be executed: tho I do not think the reason given for the Law in that Point will maintain it, which is, that the End of Punishment is the striking a Terror into others, but the execution of a Madman had not that effect; which is not true, for the Terror to the

living is equal, whether the Person be mad or in his Senses . . . But the true reason of the Law I think to be this, a Person of *non sana Memoria,* and a Lunatick during his Lunacy, is by an Act of God (for so it is call'd, tho the means may be humane, be it violent, as hard Imprisonment, terror of Death, or natural, as Sickness) disabled to make his just Defence, there may be Circumstances lying in his private Knowledg, which would prove his Innocency, of which he can have no advantage, because not known to the Persons who shall take upon them his Defence . . . .

. . . . .

"The King is therefore no otherwise benefited by the destruction of his Subjects, than that the Example deters others from committing the like Crimes; and there being so many to be made Examples of, besides those on whom the misfortunes of Madness fall, it is inconsistent with humanity to make Examples of them; it is inconsistent with Religion, as being against Christian Charity to send a great Offender quick, as it is stil'd, into another World, when he is not of a capacity to fit himself for it. But whatever the reason of the Law is, it is plain the Law is so . . . ." Remarks on the Tryal of Charles Bateman by Sir John Hawles, Solicitor-General in the reign of King William III, 3 State-Tryals 651, 652–53 (1719).

"If a man in his sound memory commits a capital offense, and before his arraignment he becomes absolutely mad, he ought not by law to be arraigned during such his phrenzy, but be remitted to prison until that incapacity be removed; the reason is, because he cannot advisedly plead to the indictment . . . And if such person after his plea, and

before his trial, become of *non sane memory,* he shall not be tried; or, if after his trial he become of *non sane memory,* he shall not receive judgment; or, if after judgment he become of *non sane memory,* his execution shall be spared; for were he of sound memory, he might allege somewhat in stay of judgment or execution." 1 Hale, The History of the Pleas of the Crown 34–35 (1736).[1]

"Another cause of regular reprieve is, if the offender become *non compos* . . . if after judgment, he shall not be ordered for execution: for *'furiosus solo furore punitur,'* and the law knows not but he might have offered some reason, if in his senses, to have stayed these respective proceedings." 4 Bl. Comm. 388–89 (1769).

However quaint some of these ancient authorities of our law may sound to our ears, the Twentieth Century has not so far progressed as to outmode their reasoning. We should not be less humane than were Englishmen in the centuries that preceded this Republic.[2] And the practical considerations are not less relevant today than they were when urged by Sir John Hawles and Hale and Hawkins and Blackstone in writings which nurtured so many founders of the Republic. If a man has gone insane, is he still himself? Is he still the man who was convicted? In any event "were he of sound memory, he might allege somewhat" to save himself from doom. It is not an idle fancy that one under sentence of death ought not, by becoming *non compos,* be denied the means to "allege somewhat" that might free him. Such an

---

[1] The first publication of Hale's *Pleas of the Crown* was of course based upon the manuscript left by him at his death in 1676. See 6 Holdsworth, A History of English Law 574, 589–90 (1924).

[2] See Report of the Committee on Insanity and Crime, Cmd. No. 2005, pp. 17, 19 (1923).

opportunity may save life, as the last minute applications to this Court from time to time and not always without success amply attest.[3]

The short of it is that American law is not more brutal than what is revealed as the unbroken command of English law for centuries preceding the separation of the Colonies. The Court puts out of sight, as it were, what is basic to a disposition of this case, namely, that not a State in the Union supports the notion that an insane man under sentence of death would legally be executed. If respect is to be given to claims so deeply rooted in our common heritage as this limitation upon State power, the Fourteenth Amendment stands on guard to enforce it.

Unless this restriction on State power is fully recognized and its implications are duly respected, the crucial questions presented by this case are avoided. We are here not dealing with the Crown's prerogative of mercy continued through the pardoning power in this country as an exercise of grace. See *Ex parte Grossman,* 267 U. S. 87. Nor are we dealing with the range of discretion vested in judges by penal laws carrying flexible instead of fixed penalties. See *Williams* v. *New York,* 337 U. S. 241. We are dealing with a restriction upon the States against taking life if a certain fact is established, to-wit, insanity,

---

[3] Insane persons do not have the capacity to plead or be tried. See *Youtsey* v. *United States,* 97 F. 937; *Forthoffer* v. *Swope,* 103 F. 2d 707. After sentence of death, the test of insanity is whether the prisoner has not "from the defects of his faculties, sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful, and the intelligence requisite to convey such information to his attorneys or the court." *In re Smith,* 25 N. M. 48, 59, 176 P. 819, 823. See also *People* v. *Geary,* 298 Ill. 236, 131 N. E. 652; *In re Grammer,* 104 Neb. 744, 178 N. W. 624.

like unto other restrictions upon the State in taking liberty or property. In view of the Due Process Clause it is not for the State to say: "I choose not to take life if a man under sentence becomes insane." The Due Process Clause says to a State: "Thou shalt not."

And so we come to the implications of this constitutional restriction upon a State in order to determine whether it can deny all opportunity to lay before some agency of government facts and circumstances which, if true, must stay the executioner's hand.

The manner in which the States have dealt with this problem furnishes a fair reflex, for purposes of the Due Process Clause, of the underlying feelings of our society about the treatment of persons who become insane while under sentence of death.

Six States no longer have the death penalty. (See Appendix, Part A.) As to the remaining 42:

I. In 30 States, execution of the death penalty is suspended upon a determination of insanity supervening after sentence.

 (a) Of these, 9 States provide (5 by statute and 4 under common law) that the inquiry shall be entirely judicial. (Part B.)

 (b) Of these, 14 States provide for the ultimate determination of sanity or insanity by a judge or jury after a hearing, upon initiation of the hearing by a designated prison or police official.

 (1) Of these, 2 States provide for judicial review of the official's decision not to initiate a hearing. (Part C–I.)

 (2) Of these, 12 States have no legislation or adjudication defining whether the official's decision is subject to review. (Part C–II.)

 (c) Of these, 7 States provide for the ultimate determination of sanity by the Governor or by a body of physicians and laymen.

 (1) Of these, 1 State appears to afford an opportunity to be heard. (Part D–I.)

 (2) Of these, 3 States appear to provide for an *ex parte* inquiry. (Part D–II.)

 (3) Of these, 3 States have no provision indicating the nature of the inquiry. (Part D–III.)

II. In 3 States, suspension of execution of the death penalty because of insanity is at the discretion of the Governor. (Part E.)

III. As to 9 States, the available legislation and decisions afford no clear basis for classification. Of these, 4 give strong indications that execution of the death penalty is suspended upon insanity supervening after sentence,[4] 3 offer insufficient material even for inference, and 2 offer no relevant material. (Part F.)

We start with the fact that not a single State gives any indication of having uprooted the heritage of the common law which deemed it too barbarous to execute a man while insane. This brings us to the mode of establishing the crucial basis for the lawful killing by a State, namely, that it kill not an insane person. Nine States make the necessary inquiry entirely judicial. Fourteen more States put the responsibility for initiating judicial inquiry, with various alternatives of judge and jury, upon an appropriate official. In ten States the determination of sanity is vested in the Governor either with or with-

---

[4] In these 4 States, 3 have statutory provisions dealing with insanity after conviction but before sentence, and 1 has a provision dealing with insanity after conviction. Compare *State* v. *Allen,* 204 La. 513, 15 So. 2d 870.

out the aid of advisors or in a separate administrative board. But even as to these, in only six States, including Georgia, is it clear that such an inquiry may be entirely behind closed doors without any opportunity for submission of facts on behalf of the person whose sanity is to be determined as a prerequisite to killing him.

This impressive body of State legislation signifies more than the historic continuity of our repulsion against killing an insane man even though he be under sentence of death. The vindication of this concern turns on the ascertainment of what is called a fact, but which in the present state of the mental sciences is at best a hazardous guess however conscientious. If the deeply rooted principle in our society against killing an insane man is to be respected, at least the minimum provision for assuring a fair application of that principle is inherent in the principle itself. And the minimum assurance that the life-and-death guess will be a truly informed guess requires respect for the basic ingredient of due process, namely, an opportunity to be allowed to substantiate a claim before it is rejected.

This is a requirement that this Court has enforced again and again when mere interests of property were involved. See e. g., Pennoyer v. Neff, 95 U. S. 714; Priest v. Trustees of Las Vegas, 232 U. S. 604. It cannot be that the Court is more concerned about property losses that are not irremediable than about irretrievable human claims. If, as was held only the other day, due process saves a man from being sent to jail for sixty days on a charge of contempt because he was tried in secret, In re Oliver, 333 U. S. 257, due process ought also to vindicate the self-respect of society by not sending a man to his death on the basis of a proceeding as to his sanity in which all opportunity on his behalf has been denied to

24

show that he is in fact in that condition of insanity which bars the State from killing him. He should not be denied the opportunity to inform the mind of the tribunal—be it a Governor, a board or a judge—that has to decide between life and death, not as a matter of grace but on the basis of law. For if he be insane his life cannot be forfeit except in violation of the law of the land.

If a man "is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged" before being convicted, *In re Oliver, supra* at 272, he should no less be allowed to have someone speak for him when the issue is not merely a prerogative of mercy or the exercise of discretion which modern penological thought, translated into legislation, vests in judges in imposing sentence. The killing of an insane man under sentence, it needs to be repeated, is in our law not a matter of discretion. Not to kill such an insane man "has its roots in our English common law heritage" no less deep than not to convict him without a hearing. See *In re Oliver, supra* at 266. The rule against killing an insane person embedded so deeply in our law as to be protected by substantive aspects of due process requires as part of procedural due process that the victim be given an opportunity through counsel or the next of kin to invoke the substantive principle of due process.

Since it does not go to the question of guilt but to its consequences, the determination of the issue of insanity after sentence does not require the safeguards of a judicial proceeding. See *Ng Fung Ho* v. *White*, 259 U. S. 276, 284–85. Nor need the proceeding be open; it may be *in camera*. But precisely because the inquiry need not be open and may be made *in camera*, it must be fair in relation to the issue for determination. In the present state of the tentative and dubious knowl-

edge as to mental diseases and the great strife of schools in regard to them, it surely operates unfairly to make such determinations not only behind closed doors but without any opportunity for the submission of relevant considerations on the part of the man whose life hangs in the balance.

To say that an inquiry so conducted is unfair because of the treacherous uncertainties in the present state of psychiatric knowledge is not to impugn the good faith of Governors or boards in excluding what is sought to be put before them on behalf of a putative insane person. The fact that a conclusion is reached in good conscience is no proof of its reliability. The validity of a conclusion depends largely on the mode by which it was reached. A Governor might not want to have it on his conscience to have sent a man to death after hearing conflicting views, equally persuasive, regarding the man's sanity. Claims obviously frivolous need of course not be heard, even as this Court does not listen to claims that raise no substantial question. It is not suggested that petitioner's claim of insanity was baseless.

It is a groundless fear to assume that it would obstruct the rigorous administration of criminal justice to allow the case to be put for a claim of insanity, however informal and expeditious the procedure for dealing with the claim. The time needed for such a fair procedure could not unreasonably delay the execution of the sentence unless in all fairness and with due respect for a basic principle in our law the execution should be delayed. The risk of an undue delay is hardly comparable to the grim risk of the barbarous execution of an insane man because of a hurried, one-sided, untested determination of the question of insanity, the answers to which are as yet so wrapped in confusion and conflict and so dependent on elucidation by more than one-sided partisanship.

To deny all opportunity to make the claim that was here made on behalf of the petitioner is in my view a denial of due process of law.

APPENDIX TO OPINION OF FRANKFURTER, J.

*State legislation and judicial decisions concerning execution of death penalty where insanity supervenes after sentence.*[1]

A. States in which problem does not arise because they have no death penalty: [2]

(1) Me. Rev. Stat. c. 117, § 1 (1944).
(2) Mich. Comp. Laws § 750.316 (1948).
(3) Minn. Stat. § 619.07 (Henderson 1945).
(4) N. D. Rev. Code § 12–2713 (1943).[3]
(5) R. I. Gen. Laws c. 606, § 2 (1938).[3]
(6) Wis. Stat. § 340.02 (1947).

---

[1] It is appropriate to give warning that the meaning attributed to some of the statutes cited in this Appendix does not have the benefit of guiding State adjudication and that, even when such adjudication is available to throw light on statutory meaning or on the State's common law, classification has been based on judicial pronouncements which are not always explicit holdings. The ascertainment of the law of a State when there is not a clear ruling by the highest court of that State is treacherous business. It should also be added that while this Appendix is based on the latest legal materials in the Library of this Court that is no guarantee that there may not be still later relevant local materials.

[2] The statutes cited give the penalty for first degree murder. See also Grünhut, Penal Reform 7 (1948).

[3] The penalty for first degree murder is life imprisonment unless a person is under sentence of life imprisonment at the time of conviction.

*B.* States suspending execution of death penalty under
statutory or common law provisions for hearing before
judge or judge and jury upon initiation by judge: [4]

 I. Statutory procedure:

 (7) Ala. Code Ann. tit. 15, § 427 (1940).

 (8) Colo. Stat. Ann. c. 48, §§ 6, 7 (1935).
See *Bulger* v. *People,* 61 Colo. 187, 156
P. 800.

 (9) Ill. Rev. Stat. c. 38, §§ 593–94 (1949).
See *People* v. *Geary,* 298 Ill. 236, 131
N. E. 652; *People* v. *Preston,* 345 Ill.
11, 177 N. E. 761.

 (10) La. Code Crim. Law & Proc. Ann. art.
267 (1943). See *State* v. *Allen,* 204
La. 513, 15 So. 2d 870, 18 Tulane L.
Rev. 497; *State* v. *Gunter,* 208 La.
694, 23 So. 2d 305; *State* v. *Hebert,*
187 La. 318, 174 So. 369; La. Laws
1918, No. 261, p. 483.

 (11) N. J. Stat. Ann. § 2:193–12 (1939) in
connection with *In re Lang,* 77 N. J. L.
207, 71 A. 47; *In re Herron,* 77 N. J. L.
315, 72 A. 133; 79 N. J. L. 67, 73 A.
599.

 II. Common law procedure:

 (12) North Carolina. See *State* v. *Vann,*
84 N. C. 722, 724; *State* v. *Godwin,*
216 N. C. 49, 3 S. E. 2d 347; *State* v.
*Sullivan,* 229 N. C. 251, 49 S. E. 2d

---

[4] In all States providing for suspension of death penalty upon
supervening insanity, the procedural problem raises two questions:
(1) who shall decide whether there has been a sufficient *prima facie*
showing of insanity to warrant initiation of a further proceeding;
(2) who shall be the fact finder in such proceeding.

458. See also N. C. Gen. Stat. Ann. §§ 122–84, 122–85 (Supp. 1949).

(13) South Carolina. See *State* v. *Bethune,* 88 S. C. 401, 71 S. E. 29. See also S. C. Code Ann. § 6239 (1942).

(14) Tennessee. See *Jordan* v. *State,* 124 Tenn. 81, 90–91, 135 S. W. 327, 329–30; *Bonds* v. *State,* 8 Tenn. 142. See also Tenn. Code Ann. §§ 4476, 4502 (Williams 1934).

(15) Washington. See *State* v. *Nordstrom,* 21 Wash. 403, 58 P. 248; *Grossi* v. *Long,* 136 Wash. 133, 238 P. 983; *State ex rel. Alfani* v. *Superior Court,* 139 Wash. 125, 245 P. 929; *State* v. *Davis,* 6 Wash. 2d 696, 717, 108 P. 2d 641, 650–51.

*C.* States suspending execution of death penalty under statutory provisions for hearing before judge or jury upon initiation by designated prison or police official: [5]

I. Official's refusal to initiate subject to judicial review:

(16) Ark. Stat. Ann. §§ 41–109, 43–2622 (1947). See *Howell* v. *Kincannon,* 181 Ark. 58, 24 S. W. 2d 953; *Howell* v. *Todhunter,* 181 Ark. 250, 25 S. W. 2d 21; *Shank* v. *Todhunter,* 189 Ark. 881, 75 S. W. 2d 382.

---

[5] See note 4 *supra.* Most of the States in Parts C and D require the official responsible for initiating the further inquiry to act if there is "good reason," or a like ground, for believing that the convicted man is insane. In some of these States the relevant statute provides that the official "may" act where "good reason" exists, thereby raising the familiar problem as to when "may," considering its function, means "must" in legislative English. Compare *Howell* v. *Todhunter,* 181 Ark. 250, 25 S. W. 2d 21.

(17) Cal. Pen. Code §§ 1367, 3701–03 (1949). See *Phyle* v. *Duffy,* 34 Cal. 2d 144, 208 P. 2d 668.

II. Whether official's refusal to initiate inquiry is subject to review undefined by legislation or adjudication:

(18) Idaho Code Ann. §§ 19–2709 to 19–2712, 19–3301 (1948).

(19) Ky. Rev. Stat. § 431.240 (1948). See Ky. Codes, Crim. Prac. §§ 295–96 (1948); *Barrett* v. *Commonwealth,* 202 Ky. 153, 259 S. W. 25; *Stucker* v. *Commonwealth,* 261 Ky. 618, 88 S. W. 2d 280; *Murrell* v. *Commonwealth,* 291 Ky. 65, 163 S. W. 2d 1.

(20) Mo. Rev. Stat. Ann. §§ 4192–94 (1939).

(21) Mont. Rev. Codes Ann. §§ 94–8009 to 94–8012 (1947).

(22) Nev. Comp. Laws Ann. §§ 11192.01 to 11192.06 (Supp. 1945).

(23) N. M. Stat. Ann. §§ 42–1404 to 42–1407 (1941).

(24) Ohio Gen. Code Ann. §§ 13456–8, 13456–9 (1939).

(25) Okla. Stat. Ann. tit. 22, §§ 1005–08 (1937). See *Bingham* v. *State,* 82 Okla. Crim. 305, 169 P. 2d 311.

(26) Pa. Stat. Ann. tit. 50, § 48 (Supp. 1948). See *Commonwealth* v. *Barnes,* 280 Pa. 351, 124 A. 636 (whether statute applies after conviction and sentence or whether common law principles govern is not clear). But cf. *Ex parte McGinnis,* 14 W. N. C. 221 (Pa. Sup. Ct.).

(27) Tex. Stat., Code Crim. Proc. arts. 921–27 (1948). See *Dotson* v. *State,* 149 Tex. Crim. 434, 195 S. W. 2d 372. A hearing may also be initiated on the affidavits of two private physicians. Cf. *Ex parte Millikin,* 108 Tex. Crim. 121, 299 S. W. 433; *Millikin* v. *Jeffrey,* 117 Tex. 134, 299 S. W. 393 (similar earlier statute).

(28) Utah Code Ann. §§ 105–37–9 to 105–37–12 (1943). See *State ex rel. Johnson* v. *Alexander,* 87 Utah 376, 49 P. 2d 408; *State* v. *Green,* 88 Utah 491, 55 P. 2d 1324.

(29) Wyo. Comp. Stat. Ann. §§ 10–1701, 10–1702 (1945).

III. Official's refusal to initiate given explicit finality without review:
None.

D. States suspending execution of death penalty under statutory provisions for inquiry by Governor or by a body of physicians and laymen on initiation by designated prison or police official:

I. Proceeding appears to afford opportunity to be heard:

(30) Iowa Code §§ 792.5 to 792.7 (1946).

II. Proceeding appears to be *ex parte:*

(31) Conn. Gen. Stat. § 8817 (1949).

(32) Kan. Gen. Stat. Ann. § 62–2406 (1935).

(33) Neb. Rev. Stat. § 29–2509 (1943). See *In re Grammer,* 104 Neb. 744, 178 N. W. 624.

III. Whether proceeding is *ex parte* or affords opportunity to be heard is uncertain:

 (34) Ariz. Code Ann. §§ 44–2307, 44–2309 (1939).

 (35) Fla. Stat. § 922.07 (1941).

 (36) Miss. Code Ann. § 2558 (1942).

E. States in which suspension of execution of death penalty because of insanity is at discretion of Governor:

 (37) Ga. Code Ann. §§ 27–2601, 27–2602 (1936), *Solesbee* v. *Balkcom,* 205 Ga. 122, 52 S. E. 2d 433.

 (38) Indiana. *Diamond* v. *State,* 195 Ind. 285, 144 N. E. 466 (only remedy is reprieve by Governor).

 (39) Mass. Gen. Laws c. 279, § 48 (1932), *Juggins* v. *Executive Council,* 257 Mass. 386, 154 N. E. 72 (only remedy seems to be reprieve by Governor with advice and consent of Executive Council).

F. States as to which legislation or judicial decisions afford no clear basis for classification:

 (40) Delaware. Compare Del. Rev. Code § 3083 (1935) (insanity after conviction but before sentence in capital cases); *id.* § 3084 (insanity while serving imprisonment sentence).

 (41) Maryland. Compare Md. Ann. Code Gen. Laws art. 27, § 798; art. 59, § 47 (1939) (insanity while serving imprisonment sentence).

 (42) New Hampshire.

32

(43) N. Y. Crim. Code § 495a. Compare 2 Rep. Atty. Gen. N. Y. 294, 297 (1914), with *People* v. *Skwirsky,* 213 N. Y. 151, 153–54, 107 N. E. 47–48.

(44) Oregon. Compare Ore. Comp. Laws Ann. §§ 26–930, 26–931 (1940) (insanity at trial).

(45) South Dakota. Compare S. D. Code § 34.2001 (1939) (a person cannot "be tried, adjudged to punishment, or punished for a public offense while he is insane"); *id.* §§ 34.2002 to 34.2004 (insanity after conviction but before sentence).

(46) Vermont.

(47) Virginia. Compare Va. Code Ann. §§ 19–208, 37–93 (1950) (insanity after conviction but before sentence); *id.* § 19–209 (insanity while serving imprisonment sentence).

(48) West Virginia. Compare W. Va. Code Ann. § 6198 (1949) (insanity after conviction or while serving sentence).