No. 19,069.

Leroy Adolph Leick v. People of the State of Colorado.

(345 P. [2d] 1054)

Decided November 5, 1959. Rehearing denied November 23, 1959.

Mr. CHARLES GINSBERG, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. GERALD HARRISON, Assistant, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE KNAUSS delivered the opinion of the Court.

THIS writ of error is prosecuted by plaintiff in error, herein referred to as defendant, to review a statutory proceeding under which is raised the issue of his sanity subsequent to conviction of first-degree murder and prior to the infliction of the death penalty decreed by the jury in the criminal case.

For reversal defendant contends that C.R.S. '53, 39-8-6 (4) is unconstitutional in that the operation thereof deprives him of due process of law; that the "reasonable

566

doubt doctrine applicable in criminal cases should apply to this statutory civil proceeding and that the trial court erred in not advising the jury concerning the result of their verdict." It is also urged that the trial court erred in not declaring a mistrial when the district attorney in his closing argument stated that a witness testified that defendant was "feigning" insanity.

We hold that the statute under which defendant seeks relief from the sentence imposed upon him is constitutional. The manner of determining the sanity of a defendant after conviction and before execution of sentence is, in the words of *Nobles v. Georgia,* 168 U.S. 398, " * * * purely a matter of legislative regulation" and, therefore, subject to such restrictions as the legislature in the exercise of its wisdom may see fit to impose. At the outset of this proceeding counsel for defendant insisted upon his right to open and close the argument and admitted that the burden of proof was on defendant to establish his insanity.

In *Solesbee v. Balkcom,* 339 U.S. 9, it was said:

"Postponement of execution because of insanity bears a close affinity not to trial for a crime but rather to reprieves of sentences in general. The power to reprieve has usually sprung from the same source as the power to pardon. * * * Recently we have pointed out the necessary and inherent differences between trial procedures and post-conviction procedures such as sentencing. *Williams v. New York,* 337 U.S. 241. In that case we emphasized that certain trial procedure safeguards are not applicable to the process of sentencing. This principle applies even more forcefully to an effort to transplant every trial safeguard to a determination of sanity after conviction. As was pointed out in the Nobles case, supra, to require judicial review every time a convicted defendant suggested insanity would make the possibility of carrying out a sentence depend upon 'fecundity in making suggestion after suggestion of insanity.' * * * The heart of the common-law doctrine has been

that a suggestion of insanity after sentence is an appeal to the conscience and sound wisdom of the particular tribunal which is asked to postpone sentence."

Mr. Justice Frankfurter in *Solesbee v. Balkcom,* supra, said: "Since it does not go to guilt but to the consequences, the determination of the issue of insanity after sentence does not require the safeguards of a judicial proceeding. See *Mg Fung Ho v. White,* 259 U.S. 276."

In *Nobles v. Georgia,* supra, it was held that in the absence of sufficient reasons for holding a full hearing into the sanity of a defendant sentenced to death, a state judge may deny such a hearing consistent with due process.

The Colorado statute involved is far more liberal and affords defendant greater safeguards than those mentioned in the cases cited, all of which have been sustained as constitutional.

In the instant case the defendant submitted no instruction directing the jury to determine the issues "beyond a reasonable doubt." The burden being upon him, and he having voluntarily assumed it, it would be illogical to invoke the "reasonable doubt" theory and shift the burden to the People, or place on defendant a greater burden than prevails in civil cases. At the very outset of this case the jury was informed by the court, with the consent of counsel, of the judgment and sentence in the criminal case. The trial judge said: "The defendant has heretofore been convicted of the crime of murder and death penalty has been imposed. Since the judgment was pronounced on the verdict, the defendant, within his rights, and pursuant to the statutes of the state of Colorado on that behalf enacted, filed a petition herein, wherein it is alleged that subsequent to the judgment as rendered in the case, the defendant has become and is now insane. That matter is the sole issue that is to be passed upon by the jury. The previous conviction and the imposition of sentence has nothing

to do whatsoever with this case and should not have anything to do whatsoever with your deliberations in this case."

The sole and only issue to be determined by the jury in this proceeding was the defendant's sanity or lack thereof occurring subsequent to conviction and sentence in the criminal action. How could this be decided except upon presentation of competent evidence? Certainly advising the jury of the effect their verdict might have under the statute concerning the status of defendant subsequent to a verdict finding him insane, could throw no light on the sole issue which this jury was called upon to determine. Even in criminal cases the jury is instructed that it has nothing to do with the punishment to be administered in the event of a conviction. This being a civil case, and assuming as we must that this carefully selected jury was possessed of common knowledge and horse sense, it is idle to urge that they might think defendant would be "turned loose on society" in the event he was found insane. Here we have a competent jury, painstakingly selected and in nowise challenged, sworn to perform its duty and instructed by a careful and learned judge that in arriving at its verdict the jury "should consider only the evidence given upon trial." Its solemn verdict under this record cannot be disregarded.

The record discloses that when questioned by the assistant district attorney, Dr. MacDonald was asked: "Q. Isn't it a possibility he (defendant) could be making these statements for some other purpose? A. That is quite possible. Q. Like what purpose? A. Well, for the purpose of appearing insane. I think this would be an understandable psychological reaction, under the circumstances. Q. Now, Doctor, the opinion you have stated to the Court and Jury, is that based entirely upon your personal observation and examination and nothing else? A. It is entirely based upon that."

In his closing argument the district attorney, referring

to the evidence given by Dr. MacDonald, said: " * * * this gentleman purely and methodically, told you what happened and gave you the results of the tests on the things that were not there. He said he is feigning insanity. I say, again * * *

"Mr. Ginsberg: I challenge that statement. That is entirely untrue. Mr. Keating: Well, let's read the last statement of the witness, if you want to, or if the Court cares to. Mr. Ginsberg: That is a very definite misstatement of fact. The Court: The Jury will recall what he said."

■ Nowhere in the record does it appear that counsel for defendant then asked the trial court to declare a mistrial on account of the statement made by the District Attorney. On ruling on the objection, the trial court said: "The jury will recall what he said." In view of the record we see no prejudicial error of which defendant may successfully complain.

In its instructions the trial court advised the jury that "the opening statements and the arguments of counsel and the remarks of the court and of counsel are not evidence." This in addition to the instruction that the jury in determining the facts should consider "only the evidence given upon the trial."

It is now urged that a mistrial should have been announced because of this statement by the District Attorney, who paraphrased the statment of Dr. Mac-Donald.

■ "Whatever is fairly deducible from the testimony comes within the legitimate sphere of argument to the jury." *Henwood v. People,* 57 Colo. 544, 143 Pac. 373. In the Henwood case, this court said: "Jurors must be supposed to have some capacity to distinguish between the fustian of partisan oratory and the rational analysis of testimony."

A clear statement of the rule is set forth in 23 C.J.S. 546, §1093, as follows:

"It is within the range of legitimate argument for

counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and if he does not make any statement of fact not fairly deducible from the evidence his argument is not improper, although the inferences discussed are illogical and erroneous. Counsel may draw and state to the jury his own conclusions from the law and the testimony, provided he does not misstate the testimony, nor facts as to which there is no testimony."

Even before Dr. MacDonald was called, Dr. Tepley, an expert witness called by defendant, testified: "If he (defendant) is putting on a show — if he is acting — he would have to be a better actor." Counsel for defendant in his closing argument told the jury, when speaking of the testimony of Dr. MacDonald: "On redirect examination Mr. Mueller [Assistant District Attorney] said to him: Dr. MacDonald, isn't it possible he might be feigning? or something to that effect and the doctor said it was possible."

A careful and competent trial judge presided at this trial, and a solemn verdict was returned by an unbiased jury. We have examined the record with care and find nothing therein which enured to the prejudice of defendant or which could be denominated reversible error. Accordingly the judgment is affirmed.

MR. JUSTICE MOORE, MR. JUSTICE HALL and MR. JUSTICE FRANTZ dissent.

MR. JUSTICE HALL dissenting:

I respectfully dissent from the majority opinion.

During the trial, Dr. MacDonald was called as a witness for the People to testify as to the defendant's then mental condition — sane or insane. He expressed it as his opinion that the defendant was sane. After describing certain acts and conduct of the defendant, the witness stated:

"* * * all these things are certainly peculiar and odd, but they are not consistent with the picture of a true mental disorder. Q. Isn't it a possibility he could be making these statements for some other purpose? A. That is quite possible. Q. Like what purpose? A. Well, for the purpose of appearing insane. I think this would be an understandable psychological reaction, under the circumstances."

When we consider the questions and answers together, it is at once apparent that the witness only stated that it is "quite possible" defendant's statements were made "Well, for the purpose of appearing insane."

In his closing argument, the district attorney, addressing the jury, called to their attention the qualifications of Dr. MacDonald, the contacts which he had with the defendant, and his opportunities for observing his conduct, and then stated, referring to Dr. MacDonald:

"He said he is feigning insanity."

After this statement was made the record discloses the following:

"Mr. Ginsberg: I challenge that statement. That is entirely untrue. Mr. Keating: Well, let's read the last statement of the witness, if you want to, or if the Court cares to. Mr. Ginsberg: That is a very definite misstatement of fact. The Court: The jury will recall what he said. Mr. Keating: Again I say, gentlemen, you heard his testimony. You draw your conclusion from his demeanor on the stand and — Mr. Ginsberg: May it please your Honor, at this time, I want to make a record. I want to make a record that counsel has deliberately made a misstatement of fact, known by him to be a misstatement, for the purpose of prejudicing this jury. I take exception thereto, and I will ask that the jury be instructed to disregard his statement. Mr. Keating: Which, of course, I deny, if the Court please. The Court: The objection will be overruled. You may proceed."

Indeed it is unfortunate that the district attorney made this bald statement of fact clearly contrary to the

record. Equally unfortunate that the trial judge, when defendant objected and requested that the jury be instructed to disregard the statement, overruled the objection and made no effort to correct the misstatement. Such failure of the trial court may well have been considered by the jury as adding verity to the misstatement and conduct of the district attorney. The offensive statement made by the district attorney to the jury was not true — it was false, though in all probability not intentionally so.

To state that parties in litigation are entitled to a fair trial is only to state the obvious. A fair trial means fair at all stages of the proceedings. In my opinion fairness and falseness cannot coexist; one is the antithesis of the other — falseness precludes fairness.

Problems presented by misconduct on the part of district attorneys in presenting evidence, argument and other matters during the course of trial proceedings are not new to trial courts and courts of review. Such problems are presented much too often. The problem in this case should never have arisen.

It is argued that even though the statement made was not literally true, yet no prejudice arose therefrom. I doubt if the jury's verdict would have been any different had the statement not been made — I *doubt,* I do not *know;* and I decline to sanction the taking of a human life where the basis for so doing is predicated in *whole* or *in any part* on conjecture.

My views are well expressed in *State v. Reeder,* 46 Wash. (2d) 888, 285 P. (2d) 884, a case in which a murder conviction was reversed because of misconduct of the prosecuting attorney, where the court said:

" * * * We realize that attorneys, in the heat of a trial, are apt to become a little over-enthusiastic in their remembrance of the testimony. However, they have no right to mislead the jury. This is especially true of a prosecutor, who is a quasi-judicial officer whose duty it is

to see that a defendant in a criminal prosecution is given a fair trial. * * *."

\* \* \*

From *Hurd v. People,* 25 Mich. 405, the court quotes:

" 'Unfair means may happen to result in doing justice to the prisoner in the particular case, yet, justice so attained is unjust and dangerous to the whole community.' " and continues with the following from *State v. Montgomery,* 56 Wash. 443, 105 Pac. 1035, 1037, 134 Am. St. Rep. 1119:

" '* * * The safeguards which the wisdom of ages has thrown around persons accused of crime cannot be disregarded, and such officers are reminded that a fearless, impartial discharge of public duty, accompanied by a spirit of fairness toward the accused, is the highest commendation they can hope for. Their devotion to duty is not measured, like the prowess of the savage, by the number of their victims.' "

For the reasons above stated the judgment should be reversed and a new and fair trial had.

MR. JUSTICE MOORE and MR. JUSTICE FRANTZ concur in this dissenting opinion.