Jimmy Lee GRAY, Petitioner-Appellant,

v.

Eddie LUCAS and the State of Mississippi, Respondents-Appellees.

No. 83–4404.

United States Court of Appeals,
Fifth Circuit.

July 15, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 18, 1983.

Certiorari Denied Sept. 1, 1983.
See 104 S.Ct. 211.

Stephen J. Ellmann, Dennis N. Balske, Montgomery, Ala., Stanfield & Holderfield, Merrida P. Coxwell, Jr., Jackson, Miss., for petitioner-appellant.

William Boyd, Sp. Asst. Atty. Gen., Jackson, Miss., for respondents-appellees.

Before POLITZ, TATE and HIGGIN-BOTHAM, Circuit Judges.

PER CURIAM:

Jimmy Lee Gray, a Mississippi prisoner awaiting execution, appeals from the district court's order denying him habeas corpus relief. We affirm.

### Background

In October 1976 petitioner Jimmy Lee Gray was indicted by a grand jury of Jackson County, Mississippi, in the murder of a three year-old girl. In a bifurcated jury trial, Gray was convicted and sentenced to death. On appeal, the Mississippi Supreme Court reversed the conviction and remanded the case for a new trial. *Gray v. State,* 351 So.2d 1342 (Miss.1977). On retrial, Gray was again convicted of capital murder and sentenced to death. The Mississippi Supreme Court affirmed both the conviction and the death sentence. *Gray v. State,* 375 So.2d 994 (Miss.1979). The United States Supreme Court denied Gray's petition for writ of certiorari. *Gray v. Mississippi,* 446 U.S. 988, 100 S.Ct. 2975, 64

L.Ed.2d 847 (1980), *rehearing denied,* 448 U.S. 912, 101 S.Ct. 30, 65 L.Ed.2d 1174 (1980).

Gray filed his first applications for writ of error coram nobis and stay of execution before the Mississippi Supreme Court in July 1980. After the state court's summary denial of the writ, Gray filed a petition for habeas corpus in federal district court. The court conducted an evidentiary hearing with respect to several of Gray's twenty-two claims of constitutional violation, denying relief. A panel of this court affirmed. *Gray v. Lucas,* 677 F.2d 1086 (5th Cir.1982), *panel rehearing and rehearing en banc denied,* 685 F.2d 139 (5th Cir.1982). The Supreme Court denied certiorari, —— U.S. ——, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983), *rehearing denied,* —— U.S. ——, 103 S.Ct. 3099, 77 L.Ed.2d 1357 (1983). On May 11, 1983, the Mississippi Supreme Court set the execution date for July 6, 1983.

### Newly-Presented Claims for Relief

On June 22, 1983 Gray submitted to the Mississippi Supreme Court a Motion for Stay of Execution along with a new application for leave to file a Petition for Writ of Error Coram Nobis. In addition Gray submitted numerous exhibits, in the form of affidavits, supporting the factual allegations of his claims. Gray's petition raised the following seven [1] claims for Coram Nobis relief, re-stated as re-urged on federal habeas review:

### Claim One

PETITIONER IS PRESENTLY INSANE. BECAUSE THE EIGHTH AND FOURTEENTH AMENDMENTS PROHIBIT THE EXECUTION OF AN INSANE PERSON, PETITIONER'S EXECUTION SHOULD BE STAYED

### Claim Two

THE TRIAL JUDGE IMPOSED AN IMPROPER BURDEN OF PROOF ON THE PETITIONER AT THE PENALTY

---

1. Gray also raised an issue regarding the constitutionality of his arrest. While this claim was raised in his federal habeas corpus petition, it has not been asserted in this appeal.

PHASE OF HIS TRIAL WHEN HE IN-STRUCTED THE JURY THAT "YOU SHALL WRITE INTO YOUR VERDICT ALL OF THE MITIGATING CIRCUM-STANCES WHICH YOU UNANIMOUS-LY FIND TO EXIST IN THIS CASE BY A PREPONDERANCE OF THE EVI-DENCE," IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

### Claim Three

THE PROSECUTION'S REPEATED REFERENCES TO PETITIONER'S FU-TURE DANGEROUSNESS AND TO THE POSSIBILITY HE WOULD BE RELEASED FROM PRISON AND KILL AGAIN IF GIVEN A LIFE SENTENCE, IN CLOSING ARGUMENT OF THE PENALTY PHASE, INJECTED AN AR-BITRARY FACTOR, INTO THE JURY'S SENTENCING DECISION, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS

### Claim Four

IN LIGHT OF THE SUPREME COURT'S RECENT GRANT OF CER-TIORARI ON THE ISSUE OF WHAT FORM OF PROPORTIONALITY RE-VIEW, IF ANY, IS CONSTITUTIONAL-LY REQUIRED IN CAPITAL CASES, THIS COURT SHOULD GRANT THE APPLICATION IN ORDER TO WITH-HOLD JUDGMENT ON THIS ISSUE UNTIL SUCH TIME AS IT CAN DE-TERMINE WHETHER THE NARROW METHOD USED BY THE MISSISSIPPI SUPREME COURT TO REVIEW PETI-TIONER'S CASE PASSES CONSTITU-TIONAL MUSTER

### Claim Five

PETITIONER WAS SENTENCED TO DEATH ON THE BASIS OF AN UN-CONSTITUTIONALLY VAGUE AG-GRAVATING FACTOR, THAT THE OFFENSE WAS ESPECIALLY HEI-NOUS, ATROCIOUS OR CRUEL

### Claim Six

PETITIONER'S EVIDENCE ESTAB-LISHES THAT MISSISSIPPI'S LE-THAL–GAS METHOD OF EXECUTION CONSTITUTES CRUEL AND UN-USUAL PUNISHMENT, IN VIOLA-TION OF THE EIGHTH AND FOUR-TEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

### Claim Seven

PETITIONER'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSIST-ANCE, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITU-TION

On June 29, 1983, the Mississippi Supreme Court denied all requested relief without benefit of an evidentiary hearing. The court's final order stated, in pertinent part:

The Application for Leave to File a Petition for Writ of Error Coram Nobis, filed June 22, 1983, Petition for Writ of Error Coram Nobis, which includes eight specific grounds, Motion for Stay of Execution pending consideration thereof, and briefs in support of the above, have been considered by the Court, sitting en banc, and it is determined they should each be denied.

It is, therefore, ordered that the Application for Leave to File a Petition for Writ of Error Coram Nobis and Petition for Writ of Error Coram Nobis are here-by denied. It is further ordered that the Motion for Stay of Execution of Sen-tence, heretofore ordered for July 6, 1983, is denied.

On June 29, 1983, Gray filed the instant Petition for Writ of Habeas Corpus in the federal district court, asserting the same claims as had been submitted to the Missis-sippi Supreme Court in the recent coram nobis petition. At oral argument the next day, Gray applied for a Stay of Execution and moved for an evidentiary hearing on the merits of his claims. The district court denied Gray's applications for a stay of execution and for certificate of probable cause. While granting Gray's application

to proceed on appeal *in forma pauperis,* the district court withheld ruling on Gray's motion for an evidentiary hearing and petition for habeas corpus. Gray filed a notice of appeal from the district court's denial of a stay of execution.

On July 2, 1983, this court granted Gray's motion for certificate of probable cause and ordered the execution stayed pending further order of the court. Thereafter the State of Mississippi filed in the United States Supreme Court a motion to vacate this court's stay. The court denied the motion.

On July 6, 1983, the Supreme Court issued *Barefoot v. Estelle,* —— U.S. ——, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), which pronounced, *inter alia,* the standards by which the federal appellate courts are to rule on an application for stay of execution and the procedures to be followed. Noting that this court's stay was entered in part because the *Barefoot* opinion was forthcoming but not yet issued, the state filed in this court a motion to vacate the stay of Gray's execution. In considering the state's motion, we recognized that *Barefoot* articulated no barrier to our vacating the stay. We ascertained, however, that we would be unable before the scheduled execution deadline to resolve the question of Gray's entitlement to an evidentiary hearing. Accordingly, we ordered that the requests for stay and the merits of Gray's habeas corpus claims be consolidated and heard after appeal from the district court's final judgment was perfected.

■ The district court dismissed Gray's petition on July 8, 1983. Gray noticed an appeal. We shall consider each of Gray's claims individually,[2] after first noting the standard of review.

---

**2.** Insofar as the State contends that our review of these issues is procedurally barred due to default in asserting the claims timely under Mississippi procedural law, we read the denial of the 1983 application for a Writ of Coram Nobis by the Supreme Court of Mississippi as, under the particular facts of this case and the contentions there urged, having decided Gray's contentions on the merits. Thus the Mississip-

*Standard of Review*

Several guiding principles are common to the issues and we pause at the outset to state them, thereafter drawing upon them as the issue at hand requires. Our overarching guide is *Barefoot v. Estelle,* —— U.S. ——, 103 S.Ct. 3383, 76 L.Ed.2d —— (1983). The court instructed:

Second and successive federal habeas corpus petitions present a different issue [from the first petition]. "To the extent that these involve the danger that a condemned inmate might attempt to use repeated petitions and appeals as a mere delaying tactic, the State has a quite legitimate interest in preventing such abuses of the writ." Brief of *Amicus Curiae* NAACP Legal Defense and Educational Fund, Inc. 41. Rule 9(b) of the Rules Governing § 2254 Cases states that "a second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief ... [or if] the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ." *See Sanders v. United States,* 373 U.S. 1, 18 [83 S.Ct. 1068, 1078–79, 10 L.Ed.2d 148] (1963); Advisory Committee Note to Rule 9(b) 28 U.S.C., p. 273. Even where it cannot be concluded that a petition should be dismissed under Rule 9(b), it would be proper for the district court to expedite consideration of the petition. The granting of a stay should reflect the presence of substantial grounds upon which relief might be granted.

The court by footnote gave added meaning to its requirement that a petitioner make "a substantial showing of the denial of [a] federal right" the court noted:

In requiring a "question of some substance," or a "substantial showing of the denial of [a] federal right," obviously the

---

pi Supreme Court itself removed any procedural bar which might otherwise impede a federal court's hearing on the merits. *Ulster County v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979); *Bell v. Watkins,* 692 F.2d 999, 1004 (5th Cir.1982); *see Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963).

petitioner need not show that he should prevail on the merits. He has already failed in that endeavor. Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are "adequate to deserve encouragement to proceed further."

### Claim One

Gray contends that his execution should be stayed because of his present insanity. Based upon affidavits presented to the Supreme Court of Mississippi and the federal district court, and found in the record before us, Gray strongly contends that he has made sufficient showing of his present insanity to require, at the least, an evidentiary hearing on the issue.

The law in all American state jurisdictions, as well as the ancient common law, does not permit the execution of a person who is presently insane. *Solesbee v. Balkcom,* 339 U.S. 9, 14–24, 70 S.Ct. 457, 460–65, 94 L.Ed. 604 (1950) (Frankfurter, J., dissenting); LaFave and Scott, *Handbook on Criminal Law* 302–04 (1972); 21 Am.Jur.2d, "Criminal Law," §§ 123–27 (1971); 24 C.J.S. "Criminal Law," § 1619 (1962). While this general principle is well established, the test for execution-staying insanity differs (or is unclear) in the various state jurisdictions, as do (or are) the procedures by which a stay of execution on this ground is sought. *The Eighth Amendment and the Execution of the Presently Incompetent,* 33 Stan.L.Rev. 765 (1980) (hereinafter, "Eighth Amendment"); *Insanity of the Condemned,* 88 Yale L.J. 533 (1979) (hereinafter, "Insanity"); Hazard & Louiselle, *Death, The State, and The Insane: Stay of Execution,* 9 UCLA L.Rev. 381 (1962). Further, as these sources show, it has at most been intimated, but never held, that a person sentenced to die has a right protected by the federal constitution that protects him against execution because of present insanity [3]—an issue that we must face here.

Mississippi law, both by statute, Miss.Code Ann. § 99–19–57 (1972), and jurisprudential expansion, *Wheeler v. State,* 219 Miss. 129, 70 So.2d 82 (1954), *Musselwhite v. State,* 215 Miss. 363, 60 So.2d 807 (1952), *Mitchell v. State,* 179 Miss. 814, 176 So. 743 (1937), affords remedies to prevent the execution of a person who is insane. However, to be entitled to the jurisprudential remedy, the insanity may not be that existing at the time of the trial (even though "not then made known to the court"), but instead it must be shown that the defendant "became insane since the judgment was rendered." *Mitchell, supra,* 176 So. at 748. *See Lewis v. State,* 155 Miss. 810, 125 So. 419 (1930). Procedurally, the issue may be raised (as it was in the present case) in Mississippi state courts by affidavits submitted with a petition for a writ of coram nobis seeking relief on that ground, *see Wheeler, supra,* and the court may deny the relief without an evidentiary hearing, if the affidavits do not show to a reasonable probability that the convicted person has become insane since his conviction.

In the present case, in denying Gray's petition for a writ of coram nobis, the Mississippi Supreme Court stated that it had considered each of the claims presented. The claim for relief on present insanity was supported by strong affidavits (see below) to the effect that he was a chronically psychotic young man; however, the mental condition or "insanity" shown was also shown to have been of a nature long pre-existing Gray's trial and conviction. Under this record showing, therefore, the petitioner was not denied any substantive or procedural due process accorded him by Mississippi law. Consequently, we must reject Gray's claim that he is entitled to federal relief on that ground. *See Welch v. Beto,*

---

**3.** *See Welch v. Beto,* 355 F.2d 1016, 1019 (5th Cir.1966): Whether "due process bars the execution of an insane person ... is an open question which the Supreme Court of the United States has not decided in terms, [although] individual justices have expressed themselves to this effect." (*Welch* did not reach the issue, because the sentenced person there had not been afforded procedural process under state law to have his insanity-based state right determined.)

355 F.2d 1016 (5th Cir.1966) (*see* note 3 *supra* ).

Gray further argues, however, that independently of Mississippi law, the federal constitution does not permit the states to execute an insane person, whether or not the insanity pre-existed or arose subsequent to the trial.

As initially noted, the Supreme Court has not held that the federal constitution bars the execution of presently insane persons. It may, however, be persuasively argued that the federal constitution does afford some nature of protection in these regards, based upon Supreme Court decisions enunciating fifth amendment due process standards and eighth amendment capital punishment standards applicable to the states. *See* "Eighth Amendment," *supra,* 32 Stan. L.Rev. at 774–78; "Insanity," *supra,* 88 Yale L.J. at 544–46.

If indeed the federal constitution affords some right by which the execution upon state conviction of a presently insane person is barred (or, at least, barred in the absence of an evidentiary hearing prior to execution), the test for insanity of this nature has never been definitely established and varies between the respective states as well as in the common law. This is partly because the underlying social reason for the general principle that uniformly prevents execution of the insane is unclear and not the subject of general agreement, whether the reason is, simply, that execution of the mentally incompetent offends notions of a civilized society, whether it is that execution of the mentally incompetent serves little deterrent purpose, or whether the basis for the principle somehow results from the inability of the insane prisoner to reflect intelligently upon his crime so as to assist in efforts to avert execution, to make his

peace with God, or to fully appreciate the reasons why he is being punished. "Insanity," *supra,* 88 Yale L.J. at 535–36.

In his dissent in *Solesbee v. Balkcom, supra,* Justice Frankfurter described the historical background and reasons advanced for the general rule that execution of the legally incompetent is not permissible and surveyed the then (1950) practices of the American states, concluding "that not a single State gives any indication of having uprooted the heritage of the common law which deemed it too barbarous to execute a man while insane." 339 U.S. at 22, 70 S.Ct. at 463. He suggested that the test for insanity of this nature should be

> After sentence of death, the test of insanity is whether the prisoner has not "from the defects of his faculties, sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful, and the intelligence requisite to convey such information to his attorneys or the court.

339 U.S. at 20 n.3, 70 S.Ct. at 462 n.3.

Both parties in the present case are content to rest on this test.[4]

In support of his claim that he is entitled at the least to an evidentiary hearing on the issue of present insanity, Gray relies upon multiple affidavits pertaining to his most recent diagnosis of mental illness, the observations of those who knew him during his youth and later, the affidavits of his own attorneys, and affidavits relating to the complete inadequacy of his pre-trial mental examinations. The substance of these is that Gray, due to severe child abuse when young, psychiatrically disturbed parentage,

---

4. Both parties have cited as an appropriate test the statement in a legal encyclopedia, 21 Am. Jur.2d, "Criminal Law", § 123, at 257–58:

> The test of insanity which will preclude execution is not the M'Naghten right and wrong test frequently applied in determining responsibility for a criminal act. Nor is the test the same as that employed to determine whether the defendant is competent to stand trial. The proper test of capacity at the time

> of punishment is whether the prisoner has sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, and a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful, and the intelligence requisite to convey such information to his attorneys or the court.

and head injuries while a child, has a deep-seated and serious mental impairment.

To fully explain Gray's mental condition, as shown by the affidavits, we will quote extensively from the affidavit and psychiatric evaluation of Gray made by Dr. Dorothy Otnow Lewis, a certified practicing and teaching psychiatrist, who is a Professor of Psychiatry at the New York University School of Medicine. Dr. Lewis' assessment was based upon a six-hour psychiatric examination of Gray on June 15, 1983, as well as upon a review of his Mississippi hospital records.

Dr. Lewis summarized her psychiatric evaluation of Gray as follows:

> In conclusion, Jimmy Lee Gray is a chronically psychotic young man whose psychosis is manifested by delusions, auditory hallucinations, and bizarre beliefs. He is also extremely intelligent and attempts to hide this symptomatology. In addition, there is evidence of some central nervous system damage manifested by lapses of attention, dizziness and nausea periodically, inability to concentrate at certain times, multiple recurrent episodes of *deja vu,* and episodes of unprovoked intense fear and anxiety as well as episodes of extreme visual and perceptual clarity. He is also frequently loose, rambling and illogical in his thought processes. His psychotic state coupled with his organic impairment undoubtedly contributed to his initial crime and to the second episode for which he is currently incarcerated. Of note, his symptomatology, if properly worked up medically and psychologically, is amenable to treatment and he should be able to live and function safely in a prison environment.

Dr. Lewis' affidavit further stated:

> 3. Mr. Gray is extremely paranoid. It is also clear that his profound mental and emotional disturbances frighten him, that his understanding of and even conscious awareness of his pathology is very limited, and that he would very much like to be considered sane and a sinner rather than to be thought to have such experiences. For these reasons, it is extremely difficult to elicit a history of symptomatology from him, and brief examinations, such as Mr. Gray has had in the past, are ill-suited to uncovering the actual nature of his illness. In fact, I believe that even the symptomatology described in my report, based on a much longer examination, is most likely an underestimate of his psychiatric illness.
>
> In addition, because of the nature of his illness and his own incomprehension and fear of it, he is not competent to assist counsel or mental health experts in demonstrating a defense of his rights in light of his illness, for his ability to identify the relevant facts to confirm this defense is so gravely impaired. Nor is he able, to this day, to understand or even to perceive or meaningfully describe the nature of the psychotic feelings which underlay the crimes for which he has been convicted, and for one of which he now faces execution. In effect, he does not understand the crime for which he was tried.
>
> 4. Mr. Gray's psychotic state, coupled with his organic impairment, undoubtedly contributed to his initial crime and to the second episode for which he is now awaiting execution. The facts concerning his mental state, indeed, demonstrate beyond question that the crime for which he faces execution (as well as the earlier offense) was committed while he was under the influence of extreme mental or emotional disturbance, and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.[5]

---

5. It is fair to state, although not (we believe) relevant to the present issue, that—by reason of a decision of the Supreme Court of Mississippi entered in March of this year—, if evidence of this type of mental illness had been discovered by counsel and presented in evidence at the sentencing hearing following conviction, Gray would most probably now be entitled to a peremptory instruction to consider as a mitigating circumstance that his capacity to conform his conduct to the requirements of law was substantially impaired; even though the mental disturbance was not of a nature to exculpate him from criminal responsibility for his act, nor necessarily of weight in determining

We expressly do not hold (or deny) that the federal constitution's fifth and eighth amendments may implicate protection of the execution of the mentally incompetent or, at the least, may mandate procedural rights by way of an evidentiary hearing to resolve this issue.

■ Nevertheless, assuming for the present purposes the existence of such right, and further assuming that the test advanced by the parties is the proper one, we are ultimately unable to hold, in the present state of the law, that the showing made by Gray, if proved at a contested evidentiary hearing, would bring him within the scope of the putative constitutional protection against execution. The showing undoubtedly indicates that Gray has serious psychotic impairments that sometimes distort his appreciation of reality, and the mental illness shown might impair his ability to secure adequate diagnosis of his mental deficiencies. Nevertheless, as we view it, these mental deficiencies—if fully proved—would nevertheless not be of a nature to deprive him of " 'sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment' or to deprive him of 'sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful.' " *Solesbee v. Balkcom, supra,* 339 U.S. at 20 n. 3, 70 S.Ct. at 462 n. 3.

Gray thus has not made a showing sufficient to justify an evidentiary hearing on the issue of whether the federal constitution bars his execution on the ground of his present mental condition.

### Claim Two

■ In Claim Two, Gray argues that the trial judge imposed an improper burden of proof on the petitioner at the penalty phase of his trial when he instructed the jury that "you shall write into your verdict all of the mitigating circumstances which you unanimously find to exist in this case by a preponderance of the evidence," in violation of

his ability to assist his counsel in his defense. *Hezekiah Edwards v. State,* (Miss.1983) (unre-

the eighth and fourteenth amendments to the United States Constitution.

The accused instruction was as follows:

The Court instructs the Jury that the mitigating circumstances that you may consider in this case are:

1. The offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance.

2. The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is substantially impaired.

3. Any other matter brought before you which you deem to be mitigating on behalf of the Defendant.

You shall write into your verdict all of the mitigating circumstances which you unanimously find to exist in this case by a preponderance of the evidence.

"Before a federal court may grant relief under 28 U.S.C. § 2254 based on alleged error in a state trial court's unobjected to charge, the error must be so egregious as to rise to the level of a constitutional violation or so prejudicial as to render the trial itself fundamentally unfair." *Bryan v. Wainwright,* 588 F.2d 1108, 1110–1111 (5th Cir. 1979). This claim of erroneous jury instruction does not present a question of constitutional dimension.

### Claim Three

■ Petitioner urges that the prosecution in its closing argument "made numerous references to petitioner's future dangerousness and to the possibility that he would be released from prison and kill again if given a life sentence." The record reflects that the prosecution argued:

(1) "now, you've heard testimony on the stand from the doctor about the percentages, the reason he may do it again, that's the reason it's in here."

(2) "And he will do it again. And there's only one way you can stop that, and

ported decision of Supreme Court of Mississippi, March, 1983, Docket No. 53,800).

that's find a verdict of the death penalty. —So he can't do it again."

(3) "... we cannot conscientiously allow people to walk the street that kill, and kill again, and again, and again, and continue to walk the street. And there's only one way that that's stopped, and that's by twelve people sitting in a jury box, as you have the last two days, and doing your job."

(4) "... but he will kill, particularly has an infinity [sic] for young female adolescent children, adolescent young people. And I say to you, I do not feel that these young girls in the future should be put walking the streets and being in their homes with this ominous threat hanging over their heads in the future."

(5) "I think we've proven our case beyond any doubt whatsoever of his dangerous potential, the potential to repeat this crime over and over. And therefore, we must ask you, and I must ask you, to return the death penalty in this case."

Critically and fatally to this claim, this argument was presented in the original petition for federal habeas. It was not thereafter pursued on appeal and we held it to be barred for that reason. *Gray v. Lucas,* 677 F.2d 1086, 1101–02 (5th Cir.1982). In paragraph 19 of his first federal petition, Gray claimed, "petitioner was deprived of his rights under the Fourteenth Amendments [sic] to the United States Constitution by inflamatory and prejudicial misconduct by the prosecution during closing argument at the guilt and sentencing phases of his capital trial."

### Claim Four

█ In Claim Four, Gray argues that in light of the Supreme Court's recent grant of certiorari on the issue of what form of proportionality review, if any, is constitutionally required in capital cases, this court should grant the application in order to withhold judgment on this issue until such time as it can determine whether the narrow method used by the Mississippi Supreme Court to review petitioner's case passes constitutional muster.

On petitioners first federal habeas, we held:

> Gray claims that the Mississippi Supreme Court's comparative review of death sentences is flawed since the court only compared Gray's case with those cases where the death sentence had been imposed and not with all the cases where it could have been imposed. Because the Supreme Court has rejected a similar argument in *Proffitt v. Florida,* 428 U.S. 242, 258–59 & n. 16, 96 S.Ct. 2960, 2969–70 & n. 16, 49 L.Ed.2d 913 (1976), we reject this claim as well.

*Gray v. Lucas,* 677 F.2d at 1111. This represents the law of the case and we decline to reconsider it. Gray urges that we should withhold decision pending the decision of the Supreme Court in *Pulley v. Harris* where it granted certiorari to determine whether review is constitutionally required and if so "what is the constitutionally required focus, scope and procedural structure of such review." *See Pulley v. Harris, cert. granted,* —— U.S. ——, 103 S.Ct. 1425, 75 L.Ed.2d 787 (1983). *See* 51 U.S. Law Week 3590. We note that a similar claim was raised in opposition to dissolve a stay in *Alabama v. Evans,* —— U.S. ——, 103 S.Ct. 1736, 75 L.Ed.2d 806 (1983), but the court declined to halt the execution.

### Claim Five

█ Gray argues that the aggravating factor of heinous, atrocious or cruel is unconstitutionally vague. We rejected this argument on the first appeal. Gray suggests that later decisions of the Mississippi Supreme Court casts doubt on the distinction between atrocious and cruel homicide and other homicide. We remain unpersuaded that the statute as applied here was impermissibly vague.

### Claim Six

The petitioner Gray next contends Mississippi's lethal-gas method of execution constitutes cruel and unusual punishment. Gray contends that he is entitled to an evidentiary hearing upon the factual issue whether Mississippi's method of execution

by lethal gas offends eighth amendment guarantees because it involves the unnecessary and wanton infliction of pain, in the nature of torture and a lingering death.

He thus relies upon principles recently articulated by the Supreme Court in *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976):

> It suffices to note that the primary concern of the drafters was to proscribe 'torture[s]' and other 'barbar[ous]' methods of punishment. [*Granucci, Nor Cruel and Unusual Punishment Inflicted: The Original Meaning,* 57 Cal.L.Rev. 839 (1969)], at 842. Accordingly, this Court first applied the Eighth Amendment by comparing challenged methods of execution to concededly inhuman techniques of punishment. *See Wilkerson v. Utah,* 99 U.S. 130, 136 [25 L.Ed. 345] (1879) ("[I]t is safe to affirm that punishments of torture ... and all others in the same line of unnecessary cruelty, are forbidden by that amendment ...'); *In re Kemmler,* 136 U.S. 436, 447 [10 S.Ct. 930, 933, 34 L.Ed. 519] (1890) ("Punishments are cruel when they involve torture or a lingering death ...').

> Our more recent cases, however, have held that the Amendment proscribes more than physically barbarous punishments. *See, e.g., Gregg v. Georgia* [428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)], at 171 (joint opinion); *Trop v. Dulles,* 356 U.S. 86, 100–101 [78 S.Ct. 590, 597–98, 2 L.Ed.2d 630] (1958); *Weems v. United States,* 217 U.S. 349, 373 [30 S.Ct. 544, 551, 54 L.Ed. 793] (1910). The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency ...,' *Jackson v. Bishop,* 404 F.2d 571, 579 (CA8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' *Trop v. Dulles, supra* [356 U.S.] at 101 [78 S.Ct. at 597]; *see also Gregg v. Georgia, supra* [428 U.S.] at 172–173 [96 S.Ct. at 2924–2925] (joint opinion); *Weems v. United States, supra* [217 U.S.] at 378 [30

S.Ct. at 553], or which 'involve the unnecessary and wanton infliction of pain,' *Gregg v. Georgia, supra* [428 U.S.] at 173 [96 S.Ct. at 2925] (joint opinion); *see also Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 463 [67 S.Ct. 374, 376, 91 L.Ed. 422] (1947); *Wilkerson v. Utah, supra* [99 U.S.] at 136.

> (Footnote omitted.)

The method of executing the death sentence in the state of Mississippi is governed by the Mississippi Code of Criminal Procedure, as follows:

> The manner of inflicting the punishment of death shall be by lethal gas, that is, by causing the person sentenced to suffer the death penalty to be placed in a properly constructed gas chamber, and then causing said gas chamber to be filled with a lethal gas commonly used in the execution of persons sentenced to suffer the death penalty, and the person placed therein allowed to remain a sufficient length of time to cause death.

Miss.Code Ann. § 99–19–51 (1972). Gray contends that execution by way of lethal gas constitutes cruel and unusual punishment, and that the statutory provision is therefore unconstitutional.

In support of this claim Gray submits numerous affidavits, including three from individuals who have witnessed executions by lethal gas. Tad Dunbar, a television news anchorman, witnessed the 1979 Nevada execution of Jesse Walter Bishop by lethal gas. Dunbar attests that he was "shocked and horrified" that death came only after Bishop's protracted struggle with the lethal cyanide gas:

> When the cyanide gas reached him, he gasped, and convulsed strenuously. He stiffened. His head lurched back. His eyes widened, and he strained as much as the straps that held him to the chair would allow. He unquestionably appeared to be in pain.

> Periodically now, perhaps at thirty second intervals, he would convulse, alternately straining and relaxing in the chair. I noticed he had urinated. The convulsions continued for approximately ten

more minutes, and you could see his chest expand, and then contract, trying to take in fresh air. These movements became weaker as the minutes ticked away. You could not tell when Bishop finally lost consciousness.

According to prison officials, Bishop died at 12:21 a.m., approximately 12 minutes after the cyanide pellets had dropped in the chamber. Death was pronounced after the shade on our observation window had been drawn, though there was still some slight movement in the body.

Howard Brodie, National News artist for CBS news, witnessed California's 1967 execution of Aaron Mitchell by lethal cyanide gas. Brodie had previously witnessed four executions, but he recalled that Mitchell's was particularly horrible:

The pellets of cyanide were released by mechanical controls, and dropped into an acid jar beneath the chair. The gas rose, and seemed to hit him immediately. Within the first minute Mitchell slumped down. I thought to myself how quickly cyanide really worked.

Within 30 seconds he lifted his head upwards again. He raised his entire body, arching, tugging at his straps. Saliva was oozing from his mouth. His eyes open, he turned his head to the right. He gazed through my window. His fingers were tightly gripping his thumbs. His chest was visibly heaving in sickening agony. Then he tilted his head higher, and rolled his eyes upward. Then he slumped forward. Still his heart was beating. It continued for another several minutes.

He was pronounced dead, twelve minutes after the pellets were released, by the doctor who could hear his heart through the stethoscope, die.

The Reverend Myer Tobey, S.J., witnessed four Maryland executions by lethal cyanide gas. Of the four, he remembered best the execution of Eddie Daniels in the late 1950's:

In an instant, puffs of light white smoke began to rise. Daniels saw the smoke, and moved his head to try to avoid breathing it in. As the gas contin-

ued to rise he moved his head this way and that way, thrashing as much as his straps would allow still in an attempt to avoid breathing. He was like an animal in a trap, with no escape, all the time being watched by his fellow humans in the windows that lined the chamber. He could steal only glimpses of me in his panic, but I continued to repeat "My Jesus I Love You," and he too would try to mouth it.

Then the convulsions began. His body strained as much as the straps would allow. He had inhaled the deadly gas, and it seemed as if every muscle in his body was straining in reaction. His eyes looked as if they were bulging, much as a choking man with a rope cutting off his windpipe. But he could get no air in the chamber.

Then his head dropped forward. The doctor in the observation room said that that was it for Daniels. This was within the first few minutes after the pellets had dropped. His head was down for several seconds. Then, as we had thought it was over, he again lifted his head in another convulsion. His eyes were open, he strained and he looked at me. I said one more time, automatically, "My Jesus I Love You." And he went with me, mouthing the prayer. He was still alive after those several minutes, and I was horrified. He was in great agony. Then he strained and began the words with me again. I knew he was conscious, this was not an automatic response of an unconscious man. But he did not finish. His head fell forward again.

There were several more convulsions after this, but his eyes were closed. I could not tell if he were conscious or not at that point. Then he stopped moving, approximately ten minutes after the gas began to rise, and was officially pronounced dead.

Gray also submits scientific and medical evidence suggesting that the method of inducing death by cyanide gas causes painful asphyxiation. Dr. Richard Traystman, Director of the Anesthesiology and Critical Care Medicine Research Laboratories at

Johns Hopkins Medical School, explained in his affidavit how cyanide causes asphyxiation:

Very simply, cyanide gas blocks the utilization of the oxygen in the body's cells. * * * Gradually, depending on the rate and volume of inspiration, and on the concentration of the cyanide that is inhaled, the person exposed to cyanide gas will become anoxic. This is a condition defined by no oxygen. Death will follow through asphyxiation, when the heart and brain cease to receive oxygen.

The hypoxic state can continue for several minutes after the cyanide gas is released in the execution chamber. The person exposed to this gas remains conscious for a period of time, in some cases for several minutes, again depending on the rate and volume of the gas that is inhaled. During this time the person is unquestionably experiencing pain and extreme anxiety. The pain begins immediately, and is felt in the arms, shoulders, back, and chest. The sensation is similar to the pain felt by a person during a heart attack, where essentially, the heart is being deprived of oxygen. The severity of the pain varies directly with the diminishing oxygen reaching the tissues.

The agitation and anxiety a person experiences in the hypoxic state will stimulate the autonomic nervous system.... [The person] ... may begin to drool, urinate, deficate, or vomit. There will be a muscular contractions. These responses can occur both while the person is conscious, or when he becomes unconscious.

When anoxia sets in, the brain remains alive for from two to five minutes. The heart will continue to beat for a period of time after that, perhaps five to seven minutes, or longer, though at a very low cardiac output. Death can occur ten to twelve minutes after the gas is released in the chamber.

Dr. Traystman concluded by stating that asphyxiation of animals for research purposes is disfavored in the scientific community. "We would not use asphyxiation, by cyanide gas or by any other substance, in our laboratory to kill animals that have been used in experiments—nor would most medical research laboratories in this country use it."

It is Gray's position that recent scientific evidence rebuts the fallacy, once commonly accepted, that death via lethal cyanide gas is painless. Gray submits that "[a] substantial body of authority now confirms that death by the administration of lethal gas is lingering, painful and terrifying, and involves substantial physical pain." While commentators have voiced this view, there has been as yet no thorough and definitive study on the precise issue Gray raises. *See, e.g.,* J. Kevorkian, *Medical Research and the Death Penalty* 17–19 (1960); Garner, "Executions and Indignities—An Eighth Amendment Assessment of Inflicting Capital Punishment," 39 Ohio St.L.J. 96, 127–28 (1978); *see also* Smith, Neuropathological Changes in Chronic Cyanide Intoxication, 200 *Nature* 179 (1963).

Gray stresses that neither the Supreme Court nor any federal court has addressed the issue whether the gas chamber constitutes cruel and unusual punishment. In cases decided in the last century, however, the court approved New York's use of the electric chair, *In re Kemmler,* 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890), and Utah's use of hanging and the firing squad, *Wilkerson v. Utah,* 99 U.S. 130, 25 L.Ed. 345 (1879). In this century, a number of states have upheld the use of the gas chamber. *Duisen v. State,* 441 S.W.2d 688, 693 (Mo. 1969), *modified by Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *People v. Daugherty,* 40 Cal.2d 876, 256 P.2d 911, *cert. denied,* 346 U.S. 827, 74 S.Ct. 47, 98 L.Ed. 352 (1953); *State v. Jon,* 46 Nev. 418, 211 P. 676 (1923). *See also In Re Anderson,* 69 Cal.2d 613, 73 Cal.Rptr. 21, 447 P.2d 117, 130 (1968), *cert. denied,* 406 U.S. 971, 92 S.Ct. 2415, 32 L.Ed.2d 671 (1972). This year, the state of Nevada enacted a statutory provision which abandons the gas chamber in favor of lethal injection. Nev.Rev.Stat. § 176.355 (1983). Nevada thus joins New Mexico in abandoning the gas chamber in favor of lethal injection. N.M.Stat.Ann. § 31–14–11 (1979). North Carolina allows death-row prisoners to choose between lethal injection or the gas

chamber.[6] In 1981, the State of Washington banned further use of hanging as a method of execution. *State v. Frampton,* 95 Wash.2d 469, 627 P.2d 922 (1981).

Gray argues strongly that he has produced a factual predicate clearly demonstrating that death by cyanide gas, causing asphyxiation at the cost of protracted pain over a period that may exceed seven minutes, may offend an indicated eighth amendment prohibition against the unnecessary and wanton infliction of pain. He contends that, therefore, he is entitled to an evidentiary hearing to prove the facts indicated in order to vindicate his constitutional claim in that regard.

Accepting Gray's proffered facts as proven, we ultimately conclude that they do not as a matter of law establish the eighth amendment claim asserted by him and, therefore, no evidentiary hearing is required. Traditional deaths by execution, such as by hanging, have always involved the possibility of pain and terror for the convicted person. Although contemporary notions of civilized conduct may indeed cause some reassessment of what degree or length is acceptable, we are not persuaded that under the present jurisprudential standards the showing made by Gray justifies this intermediate appellate court holding that, as a matter of law or fact, the pain and terror resulting from death by cyanide gas is so different in degree or nature from that resulting from other traditional modes of execution as to implicate the eighth amendment right.

### Claim Seven

Prior appellate counsel in Gray's first habeas case failed to prevail in his charge that trial counsel was ineffective. Present counsel now maintain that Richard Shapiro, the lawyer in that failing effort, was ineffective. In essence, the argument is that the reason Gray failed in his argument that his trial counsel was ineffective is that his prior habeas counsel was ineffective. Gray identifies eight asserted mistakes. The first

seven revolve around claimed failures of Shapiro to further develop petitioner's mental state. The eighth claimed deficiency was a failure of Shapiro to assert as ground for relief trial counsel's failure to object to an asserted misstatement by a witness concerning a test report describing Gray's ability to repeat the crime.

At the outset, we note that there is now virtually a pattern in habeas cases of successively accusing prior counsel of ineffective assistance. Insofar as the claims assert a denial of constitutional right to counsel, this seeming chain is broken when the claims assert ineffective assistance in the prosecution of discretionary appeals. In *Wainwright v. Torna,* 455 U.S. 586, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982) the Supreme Court held that ineffective assistance of counsel cannot violate the sixth amendment where there is no sixth amendment right to counsel. The *Torna* Court also rejected a companion due process argument pointing out that any failure of effective assistance was at the hand of a private citizen, not the state.

At the time Shapiro rendered the assertively ineffective counsel he was representing Gray in his collateral attack upon his conviction. That work included prosecution of a writ of error coram nobis and federal habeas. There is no sixth amendment right to counsel for such work. It follows that Gray's claim that Shapiro's work denied his sixth and fourteenth amendment rights is without merit.

But Gray's claim has a second dimension. He urges that because his habeas counsel was ineffective we should examine his claim of ineffective trial counsel although this court expressly rejected that claim in his first federal habeas appeal. At the least, he urges, he is entitled to an evidentiary hearing to determine the factual issues assertedly presented. Assuming for now that a constitutionally adequate counsel would be adequate in this context,

---

**6.** Presently eight of thirty-nine death-penalty jurisdictions employ the lethal gas method of execution.

the standard is as we stated in this case before:

> Constitutionally effective assistance of counsel is "not errorless counsel, and not counsel judged ineffective by hindsight, . . .," *Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir.1974). The determination of whether a counsel rendered reasonably effective assistance turns in each case on the totality of facts in the entire record. *See Washington v. Estelle,* 648 F.2d 276 (5th Cir.), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981); *United States v. Gray,* 565 F.2d 881 (5th Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1978). Thus, we must consider a counsel's performance in light of "the number, nature, and seriousness of the charges . . . the strength of the prosecution's case and the strength and complexity of the defendant's possible defenses." *Washington v. Watkins,* 655 F.2d 1346, 1357 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d [474] (1982). In this context, we recently recognized that while attorneys are not held to a higher standard in capital cases, the severity of the charge is part of the " 'totality of circumstances in the entire record' that must be considered in the effective assistance calculus."

*Gray v. Lucas,* 677 F.2d at 1092. Further,

> To establish a constitutional violation under this standard, a petitioner must demonstrate both an identifiable instance of seriously inadequate performance by counsel, and some actual, substantial disadvantage to the course of his defense resulting from that lapse. *Washington v. Strickland,* 693 F.2d 1243, 1258, 1262 (5th Cir.1982) (Unit B, *en banc* ); *Boyd v. Estelle,* 661 F.2d 388, 389–90 (5th Cir.1981); *Washington v. Watkins,* 655 F.2d 1346, 1359 n. 23, 1360 (5th Cir.1981). The inquiries are conceptually distinct, *Washington* at 1359 n. 23; the petitioner's failure to sustain either will result in a denial of the writ. *Boyd* at 389.

*Baldwin v. Maggio,* 704 F.2d 1325 (5th Cir. 1983).

An examination of the presented asserted deficiencies of Shapiro makes plain that those deficiencies revolve around a claimed failure to develop for our review the first habeas record with regard to Gray's mental status. We are persuaded that the present claim reduces to an effort to identify variations of the errors of trial counsel that were before us on the first habeas appeal. The focus then as now was upon the sufficiency of the trial counsel's development of Gray's mental status. Doubtlessly, in hindsight Shapiro, as able and experienced as this court knows him to be, might have done more. And conceivably we might say he made errors. Yet, as we have often said, it is not errorless counsel that is due. This court has now twice examined this case at length. We are persuaded that Shapiro's representation was adequate as a matter of law.

### Conclusion

Having examined each of the contentions presented, we find no basis for federal habeas relief. Accordingly, the judgment of the district court is AFFIRMED.