WINDOM, Presiding Judge.
Timothy Vincent Murphy appeals his conviction for attempted murder, see §§ 13A-6-2 and 13A-4-2, Ala. Code 1975. The circuit court sentenced Murphy to 99 years in prison.
On February 1, 2016, Murphy choked his mother, Janice Murphy, until she was unconscious and then put a gun to his head and threatened to kill himself. On February 2, 2016, Murphy threatened to mutilate his father, Vincent Murphy, and to kill himself. On February 3, 2016, Vincent filed a petition to have Murphy involuntarily committed to a mental-health facility. After conducting a hearing, the probate court found probable cause to order Murphy to be confined at a mental-health hospital for diagnosis and treatment.
Later, Deputy Randall McCrary, Sergeant Kent Sims, and Sergeant Tim Ray went to the Murphy residence to effectuate the commitment order. When Murphy saw the officers approach the house, he said, "Oh, hell no. I'm not going," ran into the house, and locked himself in a bedroom. (R. 194.) The officers entered the house and talked to Murphy through the door. Despite the officers' requests for Murphy to open the bedroom door, he refused and insisted that the officers were there to kill him. The officers repeatedly assured Murphy that they were there only to help him. Murphy, however, still refused to open the door and claimed that he would only "come out in a body bag." (R. 198.) At that point, officers decided to force their way through the bedroom door. As soon as the officers opened the bedroom door, Murphy fired at the officers and Deputy McCrary returned fire. In the exchange, Deputy McCrary and Murphy were both shot.
In accordance with the commitment order issued by the probate court, Dr. David Anakwenze, a psychiatrist at Eliza Coffee Memorial Hospital, evaluated Murphy's mental condition. After evaluating Murphy, Dr. Anakwenze sent a letter to the probate court, recommending that Murphy *172 remain at the hospital for further treatment:
"Timothy Murphy was admitted to Renaissance Center for Emotional Health at ECM Hospital on 0/02/2016 [sic] under a court petition filed by his father.
"Timothy Murphy is mentally ill. He is diagnosed with Schizophrenia Disorder, paranoid type. Mr. Murphy was admitted to the psychiatric unit after being medically stabilized at Huntsville Hospital due to a gunshot wound attained in an altercation with law enforcement officers.
"Timothy Murphy is mentally ill, currently diagnosed with Schizophrenia Disorder, paranoid type. Mr. Murphy is unable to make rational and informed decisions as to whether or not treatment for mental illness would be desirable, as he continues to evidence paranoia, delusions, and thought blocking and appears to still be responding to external stimuli. The patient will, if not treated, continue to suffer mental distress and will continue to experience deterioration in the ability to function independently. As a result of his mental illness, Mr. Murphy poses a real and present threat of substantial harm to himself and/or others. I recommend Probable Cause be found and that Mr. Murphy remain at ECM for further stabilization and treatment."
(C. 28.) On April 11, 2016, the probate court issued an order for further commitment.
In the meantime, Murphy was charged with attempted murder, see §§ 13A-4-2 ; 13A-6-2, Ala. Code 1975, for shooting Deputy McCrary.[1] Murphy pleaded not guilty and not guilty by reason of mental disease or defect. Murphy also moved the court for a mental evaluation to determine his competency to stand trial. The circuit court granted Murphy's motion, and Dr. Glenn King, a forensic psychologist, evaluated Murphy.
During his evaluation, Dr. King found Murphy to be competent to stand trial and sane at the time of the offense. The circuit court then held a hearing on Murphy's competency to stand trial and determined that Murphy was competent. Murphy disputed Dr. King's findings and moved the court for funds for an independent mental-health evaluation. The circuit court held a hearing on Murphy's motion for funds for an independent mental evaluation. At the hearing, the State argued that Murphy had been evaluated by Dr. King and that he was not entitled to another evaluation. The circuit court agreed with the State and denied Murphy's motion.
At trial, Dr. King testified for the State regarding his finding that Murphy was not suffering from any mental disease or defect at the time of the offense. Murphy attempted to rebut Dr. King's testimony and establish that he was not guilty by reason of mental disease or defect by presenting testimony from Will Motlow, the probate judge who had ordered his commitment; Dr. Anakwenze; and his mother. Although each of Murphy's witnesses had reason to believe that he suffered from mental defects, none had evaluated him for sanity at the time of the offense. See (R. 601) (Dr. Anakwenze stating that he had not evaluated Murphy to determine whether Murphy knew right from wrong). After hearing all the evidence and being instructed by the circuit court, the jury found Murphy guilty of attempted murder.
*173 The circuit court adjudicated Murphy guilty and sentenced him to 99 years in prison.
Thereafter, Murphy filed a motion for a new trial. In his motion, Murphy argued, among other things:
"The Court erred by denying [Murphy]'s Motion for Funds for independent mental health evaluation. Said denial was extremely detrimental as [Murphy] was/is indigent and could not afford independent evaluation, thus denying the constitutional rights of due process .... Evidence produced both at motion hearing and trial was that [Murphy] has a history of mental illness and had an involuntary mental commitment pending at the time of the events made the basis of this cause."
(C. 140.) The circuit court denied Murphy's motion.
On appeal, Murphy argues that the circuit court erred by denying his request for funds for an independent mental-health evaluation. This Court agrees.
In Morris v. State, 956 So.2d 431 (Ala. Crim. App. 2005), this Court recognized:
"The United States Supreme Court, in Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed. 2d 53 (1985), held that, when an indigent defendant makes a preliminary showing that his mental condition at the time of the offense is likely to be a significant factor at trial, due process requires that, at a minimum, a state provide access to a competent psychiatrist who will evaluate the defendant 'and assist in evaluation, preparation, and presentation of the defense' at the guilt phase and at sentencing. The Court began its analysis by stating, 'This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense.' 470 U.S. at 76, 105 S.Ct. 1087. '[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.' 470 U.S. at 77, 105 S.Ct. 1087.
"The Court stated that three factors are relevant to determining 'whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance in preparing the defense.' Id. The three factors are the private interest affected by the State's action, the governmental interest that would be affected if the expert were provided, and the probable value of the psychiatric assistance versus the risk of error in the proceeding if the assistance is denied. The Court observed as to the first factor, 'The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling.' 4[70] U.S. at 78, 92 S. Ct. 1983 [105 S.Ct. 1087]. The Court stated that the individual's interest in the State's attempt to convict him weighed heavily in the analysis. As to the second factor, the Court could identify only the State's financial interest weighing against the provision of a psychiatrist, and it found that interest to be insubstantial. The Court found that the State could 'not legitimately assert an interest in the maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict obtained.' 470 U.S. at 79, 105 S.Ct. 1087. As to the third factor, the Court noted, initially, that psychiatric assistance had come to play a pivotal role in criminal *174 proceedings. It noted that a majority of states and the federal government had decided that, in certain circumstances, an indigent defendant was entitled to psychiatric assistance to secure an adequate defense. The Court recognized the extensive tasks that psychiatrists had come to complete at criminal trials:
" '[W]hen the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, Solesbee v. Balkcom, 339 U.S. 9, 12 [70 S.Ct. 457, 94 L.Ed. 604] (1950), and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.'
" 470 U.S. at 80-81, 105 S.Ct. 1087.
"Additionally, the Court noted:
" 'By organizing a defendant's mental history, examination results and behavior, and other information, interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them. It is for this reason that States rely on psychiatrists as examiners, consultants, and witnesses, and that private individuals do as well, when they can afford to do so. In so saying, we neither approve nor disapprove the widespread reliance on psychiatrists but instead recognize the unfairness of a contrary holding in light of evolving practice.'
" 470 U.S. at 81-82, 105 S.Ct. 1087 (footnote omitted).
"Following its discussion of the pivotal role played by psychiatrists at criminal trials, quoted above, the Court stated:
" 'The foregoing leads inexorably to the conclusion that, without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high. With such assistance, the defendant is fairly able to present at least enough information *175 to the jury, in a meaningful manner, as to permit it to make a sensible determination.'
" 470 U.S. at 82, 105 S.Ct. 1087 (emphasis added).
"Noting that the risk of error from the denial of psychiatric assistance was highest when the defendant's mental condition was seriously in question, the Court recognized that 'a defense may be devastated by the absence of a psychiatric examination and testimony.' 470 U.S. at 83, 105 S.Ct. 1087. The Court then detailed the relevant factors in Ake's case, including that Ake's sole defense had been insanity, that he had been found incompetent to stand trial and had been committed for treatment, that psychiatrists who had examined him for competency suggested that Ake's mental illness might have begun years earlier, and that state law recognized an insanity defense and placed the initial burden of producing evidence on the defendant. 470 U.S. at 86, 105 S.Ct. 1087. These factors led the Court to conclude that Ake's mental state at the time of the offense was a substantial factor in his defense and, therefore, that the trial court's denial of his request for the assistance of a psychiatrist deprived Ake of due process. The Court also noted that, because psychiatric testimony about Ake's future dangerousness was an issue at sentencing, denying Ake a psychiatrist to assist him with his defense as to that issue also constituted a due-process deprivation."
Morris, 956 So.2d at 444-46.
This Court further explained:
"As the Supreme Court made clear ..., when an indigent defendant makes a preliminary showing that his mental health is likely to be a significant factor at trial, due process requires that the State provide access to a psychiatrist's assistance. Morris was entitled to 'the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of the State's psychiatric witnesses.' Ake v. Oklahoma, 470 U.S. at 82, 105 S.Ct. 1087 (emphasis added). The trial court apparently believed that the evaluations by Dr. Ackerson and Taylor Hardin [Secure Medical Facility] satisfied the Ake requirements. We disagree. The fundamental holding of Ake involved a defendant's receiving assistance from an independent expert who could 'assist in evaluation, preparation, and presentation of a defense.' 470 U.S. at 83, 105 S.Ct. 1087. Dr. Ackerson's and Dr. Nagi's evaluations were conducted at the court's request, and the reports of the evaluations were submitted to the court and to both parties. In no sense did these evaluations satisfy the intent expressed by the Supreme Court in Ake.
"To the extent that the trial court believed that Dr. Nagi was a neutral expert and that, therefore, Ake was satisfied, we disagree. As noted above, the Supreme Court made it clear that, once an indigent defendant had established that his sanity was likely to be a significant issue at trial, he is entitled to an independent expert -- an expert devoted to assisting his defense and one who is not providing the same information or advice to the court and to the prosecution. One of the most crucial decisions a defense expert can provide assistance with is whether a mental-health defense is viable and, if so, how best to present it to the jury. Certainly, it is unreasonable to expect that a neutral expert who reports to the court and to the parties *176 would provide the same degree of assistance to a defendant as could be expected from the defendant's own independent expert. The Supreme Court in Ake stated:
" 'Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party. When jurors make this determination about issues that inevitably are complex and foreign, the testimony of psychiatrists can be crucial and a "virtual necessity if an insanity plea is to have any chance of success." By organizing a defendant's mental history, examination results and behavior, and other information, interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them. It is for this reason that States rely on psychiatrists as examiners, consultants, and witnesses, and that private individuals do as well, when they can afford to do so.'
" 470 U.S. at 81-82, 105 S.Ct. 1087 (footnotes omitted) (emphasis added)."
Morris, 956 So. 2d 447-48.
Before trial, Murphy made "a preliminary showing that his mental condition at the time of the offense is likely to be a significant factor at trial." Morris, 956 So. 2d 444. Over a two-day period, Murphy had choked his mother until she was unconscious and had threatened to mutilate his father; after both incidents Murphy had threatened to kill himself. Based on his harmful and erratic behavior, Murphy's father filed a petition to have him involuntarily committed to a mental-health facility. The probate court found probable cause to order Murphy to be confined in a mental-health hospital for diagnosis and treatment. When law-enforcement officers approached Murphy to execute the probate court's order, Murphy ran from them and hid in the back of the house. He refused to come out, insisting that the officers were there to kill him. When the officers forced their way into the room, he fired at the officers, hitting Deputy McCrary. After he was taken into custody, Murphy was evaluated and Dr. Anakwenze found:
"Timothy Murphy is mentally ill, currently diagnosed with Schizophrenia Disorder, paranoid type. Mr. Murphy is unable to make rational and informed decisions as to whether or not treatment for mental illness would be desirable, as he continues to evidence paranoia, delusions, and thought blocking and appears to still be responding to external stimuli. The patient will, if not treated, continue to suffer mental distress and will continue to experience deterioration in the ability to function independently. As a result of his mental illness, Mr. Murphy poses a real and present threat of substantial harm to himself and/or others. I recommend Probable Cause be found and that Mr. Murphy remain at ECM for further stabilization and treatment."
(C. 28.)
Murphy pleaded not guilty and not guilty by reason of mental disease or defect. He moved the court to order a mental-health evaluation. The circuit court *177 granted Murphy's motion, and Dr. King evaluated Murphy to determine whether he was competent to stand trial and whether, at the time of the offense, he suffered from a mental disease or defect and was unable to appreciate the nature and quality or wrongfulness of his acts. Dr. King determined that Murphy did not suffer from a mental disease or defect. Murphy contested Dr. King's findings and sought funds for an independent mental-health expert.
Murphy made "a preliminary showing that his mental condition at the time of the offense is likely to be a significant factor at trial[; thus] due process require[d] that, at a minimum, a state provide access to a competent psychiatrist who [would] evaluate [him] 'and assist in evaluation, preparation, and presentation of the defense' at the guilt phase and at sentencing." Morris, 956 So.2d at 444. The circuit court, however, denied Murphy's motion, believing that Dr. King's court-ordered evaluation satisfied Murphy's right to due process. "[T]he trial court['s] belie[f] that [a] mental-health evaluation[ ] performed for the court, the results of which were made available to the parties, ... satisfied [the] due-process requirements ... misunderstood the holding of Ake v. Oklahoma." Morris, 956 So.2d at 447. Murphy was not merely entitled to a court-ordered, mental-health evaluation. He was entitled to a competent mental-health expert to "assist in evaluation, preparation, and presentation of [his mental-health] defense." Morris, 956 So.2d at 444. Accordingly, the circuit court erred by denying Murphy's motion for funds.
Further, this Court cannot say that the circuit court's error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (holding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"). At trial, Murphy pursued a defense of not guilty by reason of mental disease or defect. To overcome that defense, the State presented as a witness Dr. King, who informed the jury that, in his opinion, Murphy did not suffer from any mental disease or defect. Murphy lacked a mental-health expert to aid in cross-examining Dr. King. Additionally, and more importantly, the need for a competent, mental-health expert was central to Murphy's ability to present his defense. He was not, however, afforded a mental-health expert to help him present his defense and, thus, was forced to attempt to establish his defense through his mother, a probate judge, and a psychiatrist who had not evaluated him to determine his sanity at the time of the offense. Based on these facts, this Court cannot say that the circuit court's decision to deny Murphy funds for a mental-health expert was harmless. As such, this Court must reverse Murphy's conviction and sentence.
Murphy's attempted-murder conviction and his sentence to 99 years in prison are reversed, and the cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
Welch, Kellum, Burke, and Joiner, JJ., concur.

According to the State, "Murphy was charged by separate indictment with the offense of domestic violence by strangulation in Lauderdale CC-16-226, see, e.g., (C. 38, 91), but the trial court later granted the State's motion to nol-pross the charge." (State's brief, at 1.)